[3 NE3d 694, 980 NYS2d 357]

In the Matter of JAMES HOLMES, Respondent, v JANA WINTER, Appellant.

Argued November 12, 2013; decided December 10, 2013

**POINTS OF COUNSEL**

*Hogan Lovells US LLP,* Washington, D.C. (*Christopher T. Handman,* of the District of Columbia bar, admitted pro hac vice, and *Sean M. Marotta* of counsel), and *Hogan Lovells US LLP,* New York City (*Dori Ann Hanswirth, Theresa M. House, Nathaniel S. Boyer* and *Benjamin A. Fleming* of counsel), for appellant. I. The subpoena should be quashed because compelling Jana Winter to reveal her confidential sources would violate New York's public policy. (*People v McCartney,* 38 NY2d 618; *Matter of Codey [Capital Cities, Am. Broadcasting Corp.],* 82 NY2d 521; *New York v O'Neill,* 359 US 1; *Russian Socialist Federated Soviet Republic v Cibrario,* 235 NY 255; *J. Zeevi & Sons v Grindlays Bank [Uganda],* 37 NY2d 220; *Ehrlich-Bober & Co. v University of Houston,* 49 NY2d 574; *Debra H. v Janice R.,* 14 NY3d 576; *Boudreaux v State of La., Dept. of Transp.,* 11 NY3d 321; *Straus & Co. v Canadian Pac. Ry. Co.,* 254 NY 407; *Farrington v Pinckney,* 1 NY2d 74.) II. The Appellate Division erred as a matter of law by holding that the hardship Jana

Winter will face if required to burn her sources is irrelevant to CPL 640.10 (2)'s "undue hardship" analysis. (*Matter of Codey [Capital Cities, Am. Broadcasting Corp.]*, 82 NY2d 521; *Matter of Tran v Kwok Bun Lee*, 29 AD3d 88; *Matter of Beach v Shanley*, 62 NY2d 241.)

*Arshack, Hajek & Lehrman, PLLC*, New York City (*Daniel N. Arshack* of counsel), and *Green & Willstatter*, White Plains (*Richard D. Willstatter* of counsel), for respondent. I. Under CPL 640.10, the application of journalist shield laws and their foundational policies are irrelevant to the sending court's decision to issue a subpoena. (*New York v O'Neill*, 359 US 1; *Branzburg v Hayes*, 408 US 665; *Matter of Codey [Capital Cities, Am. Broadcasting Corp.]*, 82 NY2d 521; *People v McCartney*, 38 NY2d 618; *Matter of Hearst Corp. v Clyne*, 50 NY2d 707.) II. Civil Rights Law § 79-h does not establish any special class of citizens who are immune from being directed to appear in other states' criminal proceedings pursuant to CPL 640.10. (*People v Hawkins*, 157 NY 1; *Matter of Pitman*, 26 Misc 2d 332; *Rodriguez v United States*, 480 US 522; *Matter of Beach v Shanley*, 62 NY2d 241; *Connecticut Mut. Life Ins. Co. v Union Trust Co.*, 112 US 250; *Washington v Texas*, 388 US 14; *Chambers v Mississippi*, 410 US 284; *New York v O'Neill*, 359 US 1; *People v McCartney*, 38 NY2d 618; *Debra H. v Janice R.*, 14 NY3d 576.) III. The trial court's finding that Jana Winter failed to show she would suffer "undue hardship" within the meaning of CPL 640.10 was correct and well within the discretion of the Supreme Court as considerations of privilege are irrelevant to that determination and Winter's repeated appearances in Colorado have not caused her any hardship. (*Matter of Codey [Capital Cities, Am. Broadcasting Corp.]*, 82 NY2d 521; *In re Grand Jury Subpoena, Judith Miller*, 438 F3d 1141; *McKevitt v Pallasch*, 339 F3d 530.)

*Levine Sullivan Koch & Schulz, LLP*, New York City (*Katherine M. Bolger* of counsel), for Reporter's Committee for the Freedom of the Press and others, amici curiae. I. This Court should uphold the public policy interests in protecting journalists from compelled disclosure of confidential sources. (*McIntyre v Ohio Elections Comm'n*, 514 US 334; *Immuno AG. v Moor-Jankowski*, 77 NY2d 235; *O'Neill v Oakgrove Constr.*, 71 NY2d 521; *Matter of Beach v Shanley*, 62 NY2d 241; *Matter of Codey [Capital Cities, Am. Broadcasting Corp.]*, 82 NY2d 521; *Gonzales v National Broadcasting Co., Inc.*, 194 F3d 29; *Matter of Consumers Union of U. S., Inc.*, 495 F Supp 582.) II. Confidential

sources are essential to New York journalists' newsgathering both within the state and beyond. (*New York Times Co. v United States*, 403 US 713.) III. The subpoena places an "undue burden" on appellant.

## OPINION OF THE COURT

GRAFFEO, J.

New York's Shield Law provides an absolute privilege that prevents a journalist from being compelled to identify confidential sources who provided information for a news story. In this case, the issue is whether it would violate New York public policy for a New York court to issue a subpoena directing a New York reporter to appear at a judicial proceeding in another state where there is a substantial likelihood that she will be directed to disclose the names of confidential sources or face being held in contempt of court.

Petitioner James Holmes is charged with multiple counts of murder, among other offenses, arising from a mass shooting at a midnight screening of a "Batman" movie at an Aurora, Colorado movie theater. Twelve people were killed during the incident and 70 others were wounded. Holmes was arrested at the scene soon after the violence ended. Anticipating that the shootings would generate widespread media attention, the state court presiding over the criminal charges—the District Court for the County of Arapahoe—immediately issued an order limiting pretrial publicity in the case by either side, including law enforcement.

On July 23, 2012, while executing a search warrant, the police took possession of a notebook that Holmes had mailed to a psychiatrist at the University of Colorado before the shootings. Holmes asserted that the notebook, which apparently contained incriminating content, would be inadmissible at trial because it constituted a privileged communication between a patient and a psychiatrist. Two days later, the District Court issued a second order addressing pretrial publicity, precluding any party, including the police, from revealing information concerning the discovery of the notebook or its contents. That same day, respondent Jana Winter—a New York-based investigative reporter employed by Fox News—published an online article entitled: *Exclusive: Movie Massacre Suspect Sent Chilling Notebook to Psychiatrist Before Attack*. In the article, Winter described the contents of the notebook and indicated that she learned about it from two unidentified law enforcement sources. Other news

outlets also published stories revealing the existence of the notebook.

In October 2012, Holmes filed a motion for sanctions in the District Court, alleging that law enforcement had violated the pretrial publicity orders by speaking to Winter and maintaining that their actions undermined his right to a fair and impartial jury. The District Court then conducted a hearing to investigate the leak. Holmes called 14 police officers who had come in contact with the notebook or had learned about it prior to the publication of the Winter article. All the officers testified that they had not leaked the information to Winter and did not know who had.

After the hearing, Holmes sought a certificate under Colorado's version of the Uniform Act to Secure the Attendance of Witnesses from Without a State in Criminal Proceedings (Colo Rev Stat § 16-9-203)—the first step in the two-part process for compelling an out-of-state witness, such as Winter, to testify or otherwise provide evidence in Colorado. Holmes explained that he sought Winter's testimony and any notes she had created in relation to the article because she "appears to be the only witness that can provide the court with the name of the law enforcement agents that leaked privileged information." In January 2013, the District Court issued the requested certificate, finding that there was no other witness "that could provide the names of the law enforcement agents who may have provided information to Jana Winter" and that potential violation of the pretrial publicity order was a serious matter. The court also noted that Winter's article had described her sources as two law enforcement officers and, since all of the officers who dealt with the notebook had denied having spoken to Winter, the crime of perjury in the first degree "may be implicated." Thus, the Colorado court found Winter to be a "material and necessary" witness in the sanction proceeding and therefore requested that she spend three days in travel and testimony in the District Court at a specified date and time.

Since Winter works and lives in New York, Holmes then commenced this proceeding in New York Supreme Court pursuant to CPL 640.10 (2), New York's codification of the reciprocal Uniform Act to Secure the Attendance of Witnesses from Without a State in Criminal Proceedings, seeking the issuance of a subpoena compelling Winter to testify and provide evidence in Colorado. Anticipating that Winter would invoke the New York Shield Law, Holmes relied on our decision in *Matter of*

*Codey (Capital Cities, Am. Broadcasting Corp.)* (82 NY2d 521 [1993]) for the proposition that any issue relating to a claim of privilege could not be decided by a New York court when New York is the "sending state" under CPL 640.10 (2). Instead, Holmes maintained that privilege issues should be addressed exclusively by the Colorado court, the "demanding state," upon Winter's appearance there.

Winter opposed the subpoena application, disputing that her testimony was "material and necessary" in the Colorado case given that she was only one of a group of reporters that published articles referencing Holmes's notebook. She also argued that requiring her to testify and reveal her sources in Colorado would constitute an "undue hardship" under CPL 640.10 because such disclosure would severely compromise her ability to function as an investigative reporter and pursue her chosen livelihood. This contention was supported by the affidavit of an expert witness who explained the importance of confidential sources to investigative journalism and opined that revelation of sources could end Winter's career.

Winter further argued that the identity of her sources is absolutely privileged under New York's Shield Law. Given the nature of the testimony sought by the District Court and the fact that Colorado provides significantly less protection to journalists in this regard, Winter asserted that it would violate public policy for a New York court to issue a subpoena directing her to appear in Colorado for the purpose of divulging privileged confidential sources. She noted that *Codey* suggested that privilege issues may be considered, even when New York is the "sending state," if issuance of a subpoena would violate a strong public policy—which she maintained was the situation here.

Supreme Court granted Holmes's application and issued a subpoena directing Winter to appear in Colorado, holding that she was a material and necessary witness and that compliance with the subpoena posed no undue hardship because Holmes's defense team would pay her expenses and she was to remain in Colorado for no longer than three days. The court reasoned that the other issues Winter had raised, including her claim of privilege, were beyond the scope of a subpoena application under CPL 640.10 (2) and should be resolved by the District Court in Colorado.[1]

---

1. After Supreme Court issued the subpoena, Winter complied under protest, appearing in Colorado on three occasions in which she asserted that

The Appellate Division affirmed in a divided decision (110 AD3d 134 [2013]). The majority adopted Supreme Court's view that the only issues to be resolved by a New York court in its capacity as a "sending state" under CPL 640.10 (2) is whether Holmes established that Winter was a material and necessary witness in the Colorado proceeding and whether compelling her to testify would result in undue hardship. As to the latter, the majority viewed the concept narrowly as encompassing only "familial, monetary, or job-related hardships" pertaining to the time, expense and inconvenience associated with the trip to the other jurisdiction—which did not include any consequences flowing from the testimony the witness would be required to give (110 AD3d at 137). Relying on *Codey*, the majority reasoned that it would be inefficient and inconsistent with the reciprocal scheme for the "sending state" to entertain issues relating to admissibility and privilege of the testimony sought. Thus, the majority declined to entertain Winter's Shield Law argument, although it noted that the record did not establish "with absolute certainty" that the Colorado District Court would require her to disclose the identity of confidential sources (110 AD3d at 138).

A two-Justice dissent concluded that the subpoena application should have been denied. Although recognizing the general rule that issues relating to admissibility and privilege are not entertained by the "sending state" in the CPL 640.10 (2) context, the dissent maintained that language in a footnote in *Codey* supported recognition of an exception in cases where the prospective witness makes a compelling claim that issuance of the subpoena would violate a strong public policy of this state. On the merits, the dissent determined that Winter should be able to claim the protections of the New York Shield Law to avoid issuance of the subpoena because Colorado's Shield Law contains significantly less protection in relation to confidential sources and there was a substantial possibility—indeed, a near certainty—that the District Court would require Winter to disclose her sources or be held in contempt. Finally, even absent

the information sought was privileged under the New York and Colorado Shield Laws. Colorado has deferred resolution of Winter's privilege claim pending disposition of several other related issues. At this juncture, her case continues to present a live controversy since an order of this Court reversing the Appellate Division and dismissing Holmes's CPL 640.10 (2) application will result in nullification of the subpoena, meaning that Winter will have no continuing legal obligation to return to Colorado and give further testimony—regardless of Colorado's resolution of the privilege issue.

consideration of the privilege issue, the dissent found that Winter had established "undue hardship" under the statute because she demonstrated, through uncontradicted evidence, that issuance of the subpoena would put her in an impossible situation: she would be forced to choose between incarceration (if she refused to divulge the information) or loss of her livelihood (if she provided the information sought by the Colorado court).

Winter appeals as of right on the two-Justice dissent at the Appellate Division (CPLR 5601 [a]). In this Court, she continues to argue that issuance of the subpoena under the circumstances presented here is antithetical to New York's well-established public policy in favor of protecting the anonymity of confidential sources, as embodied in the New York Constitution and the New York Shield Law. We therefore begin by examining that public policy.

### Article I, § 8 of the New York Constitution and the New York Shield Law

New York has a long tradition, with roots dating back to the colonial era, of providing the utmost protection of freedom of the press. Our recognition of the importance of safeguarding those who provide information as part of the newsgathering function can be traced to the case of "John Peter Zenger who . . . was prosecuted for publishing articles critical of the New York colonial Governor after he refused to disclose his source" (*Matter of Beach v Shanley*, 62 NY2d 241, 255 [1984, Wachtler, J., concurring]). A jury comprised of colonial New Yorkers refused to convict Zenger—an action widely viewed as one of the first instances when the connection between the protection of anonymous sources and the maintenance of a free press was recognized in the new world. In acknowledging the critical role that the press would play in our democratic society, New York became a hospitable environment for journalists and other purveyors of the written word, leading the burgeoning publishing industry to establish a home in our state during the early years of our nation's history.

Article I, § 8 of the New York Constitution—our guarantee of free speech and a free press—was adopted in 1821, before the First Amendment was rendered applicable to the states (*O'Neill v Oakgrove Constr.*, 71 NY2d 521, 529 [1988]). The drafters chose not to model our provision after the First Amendment, deciding instead to adopt more expansive language:

> "Every citizen may freely speak, write and publish his or her sentiments on all subjects . . . and no law shall be passed to restrain or abridge the liberty of speech or of the press" (NY Const, art I, § 8).

This was in keeping with "the consistent tradition in this State of providing the broadest possible protection to 'the sensitive role of gathering and disseminating news of public events' " (*O'Neill*, 71 NY2d at 529, quoting *Beach*, 62 NY2d at 256).

In furtherance of this historical tradition, the legislature adopted the Shield Law in 1970. Among other protections, the statute grants an absolute privilege precluding reporters from being compelled to reveal the identity of confidential sources:

> "Notwithstanding the provisions of any general or specific law to the contrary, no professional journalist or newscaster . . . shall be adjudged in contempt by any court in connection with any civil or criminal proceeding . . . for refusing or failing to disclose any news obtained or received in confidence or the identity of the source of any such news coming into such person's possession in the course of gathering or obtaining news for publication" (Civil Rights Law § 79-h [b], as added by L 1970, ch 615, as amended by L 1975, ch 316; L 1981, ch 468, § 2; L 1990, ch 33, § 1).

Information subject to the privilege is "inadmissible in any action or proceeding or hearing before any agency" (Civil Rights Law § 79-h [d]). The Shield Law therefore prohibits a New York court from forcing a reporter to reveal a confidential source, both by preventing such a directive from being enforced through the court's contempt power and by rendering any evidence that is covered by the provision inadmissible.

Another subdivision of the statute largely codified our decision in *O'Neill v Oakgrove Constr.* (*supra*, 71 NY2d 521 [1988]), which recognized that article I, § 8 provides reporters with a "qualified privilege" against compelled disclosure of "nonconfidential news"—information that was not received in confidence—unless the party seeking disclosure establishes that the news "(i) is highly material and relevant; (ii) is critical or necessary to the maintenance of a party's claim, defense or proof of an issue material thereto; and (iii) is not obtainable from any alternative source" (Civil Rights Law § 79-h [c], as added by L 1990, ch 33, § 2).

It is clear from the legislative history of these provisions that the legislature believed that such protections were essential to

maintenance of our free and democratic society. Prior to the adoption of the first statute in 1970, lawmakers considered affidavits prepared by several luminaries of the profession— including Walter Cronkite, Eric Sevareid and Mike Wallace— emphasizing the critical importance of protecting the anonymity of confidential sources in order to assure a continued flow of information to reporters and, thus, to the public (*see* Bill Jacket, L 1970, ch 615 at 66-76).[2] The views expressed by these reporters were echoed by Governor Nelson Rockefeller in his memorandum approving the legislation. There he emphasized that "[t]he threat to a news[person] of being charged with contempt and being imprisoned for failing to disclose his [or her] information or . . . sources can significantly reduce his [or her] ability to gather vital information" (Governor's Approval Mem, Bill Jacket, L 1970, ch 615 at 91, 1970 Legis Ann at 508). The Governor described freedom of the press as "one of the foundations upon which our form of government is based," concluding that "[a] representative democracy, such as ours, cannot exist unless there is a free press both willing and able to keep the public informed of all the news" (*id.*). Moreover, it is evident from the approval memorandum that he and the legislature intended the statute to provide the highest level of protection in the nation: "This 'Freedom of Information Bill for Newsmen' will make New York State—the Nation's principal center of news gathering and dissemination—the only state that clearly protects the public's right to know" (*id.*).

This articulated legislative purpose to protect against incursions on press freedom was repeatedly reaffirmed in the years after the original Shield Law was enacted when the statute was

---

2. The affidavits were prepared in connection with a motion to quash a subpoena in a case that was pending when the Shield Law was under consideration by the legislature and which involved an investigative reporter from the New York Times who was subpoenaed by a federal grand jury in California to testify concerning knowledge he obtained about the Black Panther organization. Two lower courts held that the First Amendment protected the reporter from being compelled to reveal his sources or disclose information provided to him in confidence, differing only on whether the reporter could avoid appearing at the grand jury altogether (*Caldwell v United States*, 434 F2d 1081 [9th Cir 1970] [reporter could not be compelled to appear at grand jury], *vacating* 311 F Supp 358 [ND Cal 1970] [although required to appear at grand jury, reporter was entitled to protective order precluding questioning concerning confidential sources or information]). However, deciding the case with *Branzburg v Hayes* (408 US 665 [1972]), the United States Supreme Court disagreed, holding that the reporter could not rely on the First Amendment to avoid appearing and giving evidence in response to a grand jury subpoena.

amended several times in an effort to strengthen its provisions, often in response to judicial decisions that the legislature viewed as affording inadequate protections to reporters. For example, in 1981 the legislature passed amendments intended to "correct loopholes and fill gaps in the existing statute," indicating this was necessary because "[c]ase history makes it abundantly clear that the courts have been all too often disinclined to follow the letter or even the spirit of the existing law" (*Beach*, 62 NY2d at 250, quoting Assembly Sponsor's Mem, Bill Jacket, L 1981, ch 468 at 4).

As a result, New York public policy as embodied in the Constitution and our current statutory scheme provides a mantle of protection for those who gather and report the news—and their confidential sources—that has been recognized as the strongest in the nation. And safeguarding the anonymity of those who provide information in confidence is perhaps the core principle of New York's journalistic privilege, as is evident from our colonial tradition, the constitutional text and the legislative history of the Shield Law.

This is reflected in our decision in *Matter of Beach v Shanley*, which involved a controversy between a television reporter and a grand jury that was investigating the unauthorized disclosure of a sealed report issued by a prior grand jury. In exchange for an express promise to keep his identity secret, a source apparently told the reporter that the earlier grand jury had recommended the removal of the local sheriff in connection with an investigation into the illegal retention and sale of guns. When this information was revealed in a news broadcast, the second grand jury was convened to determine whether the contents of the sealed report had been disclosed to the reporter by a grand juror, public official or other public employee in violation of Penal Law § 215.70—conduct that constitutes a class E felony. Subpoenas were issued to the reporter seeking his testimony and notes on the source of the news report.

After reviewing the history of the Shield Law and considering its language, we reversed the order of the Appellate Division, which had directed the reporter's appearance at the grand jury, and ordered that the subpoenas should have been quashed. We explained:

> "The inescapable conclusion is that the Shield Law provides a broad protection to journalists without any qualifying language. It does not distinguish between criminal and civil matters, nor does it except

situations where the reporter observes a criminal act . . . Although this may thwart a grand jury investigation, the statute permits a reporter to retain his or her information, even when the act of divulging the information was itself criminal conduct. Even if one were to be in disagreement with the wisdom of the policy underlying section 79-h and no matter how heinous the crime under investigation, the courts are not free to ignore the mandate of the Legislature and substitute a policy of their own" (*Beach*, 62 NY2d at 251-252 [internal quotation marks and citations omitted]).

*Beach* was decided on purely statutory grounds under the doctrine of constitutional avoidance, although then-Judge Wachtler noted in a concurrence that the protection of confidential sources was "essential to the type of freedom of expression traditionally expected in this State and should be recognized as a right guaranteed by the State Constitution" (*id.* at 256 [Wachtler, J., concurring]). In *O'Neill*, we later confirmed that article I, § 8 also encompasses a journalist's privilege as part of the guarantee of free speech and a free press.

It is therefore evident based on the New York Constitution, the Shield Law and our precedent that a New York court could not compel Winter to reveal the identity of the sources that supplied information to her in relation to her online news article about Holmes's notebook. Holmes does not argue otherwise but relies on our decision in *Matter of Codey (Capital Cities, Am. Broadcasting Corp.)* (*supra*, 82 NY2d 521 [1993]) for the proposition that, when New York functions as the "sending state" in relation to a CPL 640.10 (2) application, issues concerning testimonial privilege—including the applicability of the absolute privilege afforded by the Shield Law—simply cannot be considered by a New York court. We next address this issue.

## CPL 640.10 and *Codey*

CPL 640.10 (2) is New York's codification of the Uniform Act to Secure the Attendance of Witnesses from Without a State in Criminal Proceedings, which has been adopted by all 50 states. The Uniform Act creates a two-step procedure for compelling the appearance of a witness located in another jurisdiction. First, the relevant court in the demanding state—the jurisdiction that seeks the witness's testimony—must issue a "certificate" finding "that there is a criminal prosecution pending in

such court . . . , that a person being within this state is a material witness in such prosecution . . . and that his [or her] presence will be required for a specified number of days" (CPL 640.10 [2]). Next, if the witness whose testimony is sought is present in New York, meaning New York is the "sending state," the certificate is presented to a Supreme Court Justice or a County Court Judge in the county where the witness is located and that court conducts a hearing to determine whether to issue a subpoena directing the witness to appear in the demanding state. A subpoena is appropriate, however, only if the New York court determines

> "that the witness is material and necessary, that it will not cause undue hardship to the witness to be compelled to attend and testify in the prosecution . . . , and that the laws of the [demanding] state . . . will give to him [or her] protection from arrest and the service of civil and criminal process" (CPL 640.10 [2]).

The latter clause prevents the witness from being subjected to arrest for any unrelated outstanding warrant or from being served with process while answering the subpoena—but it has not been interpreted as protecting the witness from being held in contempt for failing to give testimony in the demanding state.

In *Codey*, a New York news organization was subpoenaed by a New Jersey grand jury that was investigating illegal point shaving and gambling activities associated with collegiate basketball. The news organization had previously broadcast a story that contained brief excerpts of an interview with an unidentified player who was disguised in the report to preserve his anonymity and who provided information relevant to the investigation. The player later revealed his identity to the grand jury and decided to cooperate in the investigation but he could not recall everything that he had said during the 30-minute videotaped interview with the reporter, only a small portion of which had been aired during the broadcast. Thus, the grand jury sought to obtain videotaped outtakes of the interview and the reporter's notes. Invoking CPL 640.10 (2) in an effort to secure the attendance of the New York reporter at its proceedings in New Jersey, the New Jersey grand jury obtained the requisite certificate and commenced a proceeding in the New York county where the news organization was based requesting issuance of a subpoena. In response, the broadcaster contended that the material sought was privileged under the New Jersey Shield Law, maintaining

that New Jersey grants an absolute privilege protecting information of the type sought there.

Supreme Court issued the subpoena, without deciding the privilege issue. But the Appellate Division reversed, reasoning that New York—which was functioning as the sending state— must resolve the reporter's claim that the information sought was privileged in the demanding state because, if the claim had merit, the evidence would be inadmissible in the demanding state and therefore could not be material or necessary to the criminal investigation. The Appellate Division then analyzed New Jersey's Shield Law, concluding that the requested information was protected by an absolute privilege, similar to the privilege granted under New York's Shield Law.

On appeal, we reversed and directed that the subpoena should be reinstated, holding that the Appellate Division had erred in considering the news organization's claim that the information was privileged under New Jersey law. We determined that the inquiry conducted by the sending state to determine whether the information sought is "material and necessary" within the meaning of CPL 640.10 (2) is limited and does not encompass the concepts of admissibility, disclosability or privilege. Indicating that "[i]t would be inefficient and inconsistent with the over-all purpose and design of this reciprocal statutory scheme to permit the sending State's courts to resolve questions of privilege on a CPL 640.10 (2) application" (*Codey*, 82 NY2d at 529), we concluded that "evidentiary questions such as privilege are best resolved in the State—and in the proceeding—in which the evidence is to be used" (*id*. at 530). We explained that

> "[i]n view of the sensitivity of privilege issues to local policy concerns and particularized legal rules, it would make little sense to construe CPL 640.10 (2) as authorizing the courts of this State to determine questions of privilege that arise out of the law of another jurisdiction and which relate to specific criminal proceedings pending in that other jurisdiction" (*id*.).

In *Codey*, we articulated the general rule that a claim that the evidence sought will be inadmissible in the demanding state based on the applicability of a privilege is simply not a proper basis for a sending state, such as New York, to deny the subpoena request under the Uniform Act. In this case, the

Appellate Division majority understandably relied on this proposition when denying Winter relief. However, we also clarified in *Codey* that

> "[o]ur holding should not be construed as foreclosing the possibility that in some future case a strong public policy of this State, even one embodied in an evidentiary privilege, might justify the refusal of relief under CPL 640.10 even if the 'material and necessary' test set forth in the statute is satisfied" (*id.* at 530 n 3).

Winter argues that this is such a "future case" and we agree.

We begin with the observation that this case is distinguishable from *Codey* in several critical respects. Here, Winter relies on the journalist's privilege embodied in the New York Shield Law. In *Codey*, the news organization argued that the reporter's testimony, along with the video outtakes and notes, were privileged under the law of New Jersey which, like New York, offers substantial protection to reporters in relation to unpublished materials. This distinction is significant for two reasons. First, since the reporter in *Codey* was relying on another state's law, it made sense that the other state should resolve any issue that arose concerning the applicability of the privilege. We emphasized this in the decision when we noted that privilege issues raise "local policy concerns," which militated against a New York court "determin[ing] questions of privilege that arise out of the law of another jurisdiction" (*Codey*, 82 NY2d at 530).

Second, because there was no claimed disparity between the protection afforded in the demanding state and that provided in New York in relation to the information sought, no comparable public policy issue was presented in *Codey*. There the reporter did not argue that he needed the protection of the New York courts because New Jersey would resolve the privilege issue in a manner offensive to a strong public policy of this State—he contended just the opposite, asserting that New York should decline to issue the subpoena because the videotaped outtakes were privileged under New Jersey law. In contrast, here Winter makes a compelling argument that the promise of confidentiality she provided to her sources will not be honored by the Colorado courts. Colorado offered no privilege to reporters until 1990 and its current Shield Law grants only qualified, as opposed to absolute, protection—even in relation to the identity of

sources of confidential news.[3] Essentially, the Colorado courts employ a balancing test to determine whether a reporter can be required to reveal an anonymous source—a procedure in stark contrast to the absolute privilege cloaking that information in New York.

This brings us to perhaps the most important factual distinction between this case and *Codey*. In *Codey*, the New Jersey grand jury did not subpoena the reporter for the purpose of compelling him to reveal the identity of a confidential source. The basketball player who had been interviewed on condition of anonymity had come forward of his own accord and New Jersey authorities already knew who he was—they sought to obtain the video outtakes from the interview because he could not recall everything he had said to the reporter. To be sure, nonpublished material such as this receives significant protection in New York (and apparently also in New Jersey), even when the source is known. But we cannot ignore the obvious distinction between the material sought in *Codey* and the testimony at issue here.

It is clear from the certificate issued by the District Court in this case that the only purpose of requiring Winter to appear in Colorado is to compel her to reveal the identities of the individuals who supplied the information she reported in the news story—information obtained in exchange for a promise of confidentiality. Disclosure of this information will enable the District Court to determine the origin of the leaks, presumably so that the individuals involved can be sanctioned for violation of the nondisclosure order and perhaps even prosecuted for perjury. This is a valid objective in light of the apparent breach of the District Court's pretrial "gag" order. But this predictable chain of events is precisely the harm sought to be avoided under our Shield Law for it is fear of reprisal of this type that closes

---

**3.** Under Colorado law, the qualified privilege protecting the identity of confidential sources can be abrogated if the party seeking the information can prove, by a preponderance of the evidence, that (1) "the news information is directly relevant to a substantial issue involved in the proceeding," (2) "the news information cannot be obtained by any other reasonable means," and (3) "a strong interest of the party seeking to subpoena the newsperson outweighs the interests under the first amendment to the United States constitution of such newsperson in not responding to a subpoena and of the general public in receiving news information" (Colo Rev Stat § 13-90-119 [3]). As Winter points out, when issuing the certificate, the Colorado court also essentially concluded that the first two prongs are met here—it found that Winter's testimony was probative of the issue to be resolved (who leaked the information) and that the information sought could not be secured by any other means.

mouths, causing news sources to dry up and inhibiting the future investigative efforts of reporters. The District Court is understandably troubled by the violation of the restrictions it imposed on pretrial disclosure, but the New York Shield Law "permits a reporter to retain his or her information, even when the act of divulging the information was itself criminal conduct" (*Beach*, 62 NY2d at 252).

As we have explained, protection of the anonymity of confidential sources is a core—if not *the* central—concern underlying New York's journalist privilege, with roots that can be traced back to the inception of the press in New York. Although there are uncertainties concerning the application of the outer reaches of our statute, particularly the scope of the qualified privilege for nonconfidential news which must be determined on a case-by-case basis (*see e.g. People v Combest*, 4 NY3d 341 [2005] [criminal defendant met his burden under Shield Law to compel production of nonconfidential videotapes of defendant's interrogation by police made by documentary film crew]), there is no principle more fundamental or well-established than the right of a reporter to refuse to divulge a confidential source. And that concern is directly implicated here given that the only purpose for Winter's testimony is to ascertain who leaked the information regarding the discovery of the notebook. Indeed, absent that information, there is no material or necessary testimony Winter could offer in connection with the Colorado proceeding.

Moreover, as a New York reporter, Winter was aware of—and was entitled to rely on—the absolute protection embodied in our Shield Law when she made the promises of confidentiality that she now seeks to honor. Given that this is the case, and in light of the significant disparity between New York and Colorado law, she was entitled to have the Shield Law issue adjudicated in New York before the subpoena was issued, even though it relates to testimony sought in the courts of another state. We therefore conclude that an order from a New York court directing a reporter to appear in another state where, as here, there is a substantial likelihood that she will be compelled to identify sources who have been promised confidentiality would offend our strong public policy—a common-law, statutory and constitutional tradition that has played a significant role in this State becoming the media capital of the country if not the world.

Permitting a New York court to consider the privilege issue raised here in the context of a CPL 640.10 (2) proceeding will

not, as Holmes suggests, have the effect of expanding the territorial effect of New York law beyond our borders—and this is true even if we assume that Winter was in Colorado when she spoke with her confidential sources. The outcome of this case does not (and should not) turn on whether Winter received the information while she was in Colorado or obtained it over the telephone or via computer while sitting in her New York office. A rule predicated on where a New York reporter was located when she learned of an anonymous tip would lead to arbitrary results and would ignore several practical realities, including the widespread use of cutting-edge communication technology to facilitate the newsgathering process and the global nature of today's news market (it is now possible for a journalist based in New York to cover a California story while on assignment in Singapore through the use of email, text messaging and the like). New York journalists should not have to consult the law in the jurisdiction where a source is located or where a story "breaks" (assuming either is ascertainable) in order to determine whether they can issue a binding promise of confidentiality.

The dissent apparently views this case as presenting a conflict of laws issue and would resolve it pursuant to Restatement (Second) of Conflict of Laws § 139. Under that provision—which we have never applied—if there is a disparity between the laws in two states such that a communication is privileged in one but not the other, the general rule is that the privilege will not be honored by the court of the "forum" state (the court where the evidence is sought to be admitted).[4] We cited the Restatement in *Codey* in support of the proposition that in most instances privilege issues should be resolved in the courts of the demanding jurisdiction (*Codey*, 82 NY2d at 530)—a view that we do not retreat from today. But we certainly did not apply the Restatement analysis, which affords significance to the location where

4. Subsection (1) directs that evidence that was not privileged in the state "which has the most significant relationship with the communication will be admitted," even if the evidence would be privileged in the "forum" state—the jurisdiction where the judicial proceeding is underway—unless to do so would violate a strong public policy of the forum state. Likewise, under subsection (2), evidence that is privileged in the state "which has the most significant relationship with the communication" but that is not privileged in the forum jurisdiction should also be admitted "unless there is some special reason why the forum policy favoring admission should not be given effect." The Restatement therefore reflects a policy favoring the admissibility of privileged testimony in the event of a conflict.

the communication occurred, among other factors.[5] We need not decide whether section 139 reflects a policy that should be adopted in New York in other contexts—plainly, New York law governs here since we are applying New York statutory and decisional law (CPL 640.10 [2] and *Codey*) to determine whether a New York court should issue a subpoena. It is enough to note that the provision was clearly not designed to resolve controversies involving journalist shield laws (a type of privilege not mentioned in the commentary), nor does it supply a workable rule that would be consistent with New York public policy.[6]

And lest there be any confusion, we reiterate that the issue we confront is whether a New York court should issue a subpoena compelling a New York journalist to appear as a witness in another state to give testimony when such a result is inconsistent with the core protection of our Shield Law. Thus, the narrow exception we recognize today, which permits a New York court to consider and apply New York's journalist's privilege in relation to issuance of its own process—a subpoena—in a narrow subset of cases, is not tantamount to giving a New York law extraterritorial effect.

This is not the first time that we have relied on the Shield Law to recognize an exception to the typical rules governing subpoenas. In *Beach* we held that a grand jury subpoena should

---

**5.** If we had, we would surely have mentioned in *Codey* that the videotaped interview between the North Carolina State University basketball player and the New York reporter occurred at a hotel in Albany, New York—a fact that the dissent would apparently view as important if not dispositive, even though the law of the forum state always governs under the Restatement.

**6.** Although the inquiry is not dispositive under the Restatement because the law of the forum state is paramount, section 139 suggests that the focus should be on the "state which has the most significant relationship with the communication," noting in Comment *e* that this "will usually be the state where the communication took place" unless there was a "prior relationship between the parties to the communication" in which case "the state of most significant relationship will be that where the relationship was centered" (Restatement [Second] of Conflict of Laws § 139, Comment *e*). But there is also an exception to this exception, because the latter rule will not apply if "the state where the communication took place has substantial contacts with the parties and the transaction" (*id.*). In order to navigate this complicated test, the court would have to know the identity of both parties to the communication, the nature and scope of their prior relationship (if any), and the location of the conversation (which raises its own problems, as noted above, since they may not have been in the same place). In a case such as this involving an attempt to discover the identity of a confidential source, the standard would be impossible to apply because most of the information needed to apply the test would be the very same information the reporter seeks to protect as privileged under the Shield Law.

have been quashed where the only testimony sought was the identity of a broadcast reporter's confidential source. This deviated from the general rule governing subpoenas ad testificandum, which is that a claim of privilege cannot be asserted until the witness appears before the requisite tribunal and is presented with a question that implicates protected information. We declined to apply that rule in *Beach* because "the entire focus of the Grand Jury's inquiry would be on the identity of [the reporter's] confidential source," reasoning that no legitimate purpose would be served by requiring the witness to go through the formality of appearing before the grand jury only to refuse to answer questions concerning the information sought (*Beach*, 62 NY2d at 248). Compelling a reporter to appear in court to respond to a subpoena that seeks information that is clearly cloaked with an absolute privilege can itself be viewed as a significant incursion into the press autonomy recognized in article I, § 8 and the Shield Law. Our approach was consistent with the reality that "[t]he nature of the press function makes it a more likely target for subpoenas which, in turn, will generate cost and diversion in time and attention from journalistic pursuits" (*O'Neill*, 71 NY2d at 533 [Bellacosa, J., concurring] ["Journalists should be spending their time in newsrooms, not in courtrooms as participants in the litigation process"]). The same concerns inform our decision in this case.

Application of a limited public policy exception in these unusual circumstances should not upset the *Codey* rule, which we reaffirm: absent a threatened violation of an extremely strong and clear public policy of this State such as is present here, New York courts adjudicating CPL 640.10 (2) applications should decline to resolve admissibility issues, including privilege claims, so that they can be decided in the demanding state. Because the exception will rarely be applicable, we do not anticipate that today's holding will be interpreted as an erosion of the doctrine of comity or as otherwise significantly impairing the procedure for securing the attendance of out-of-state witnesses. To obtain relief, a party seeking to avoid issuance of a subpoena under CPL 640.10 (2) will have to establish that a strong public policy is implicated and that there is a substantial likelihood that an order compelling the witness's appearance and testimony in the other jurisdiction would directly offend that policy. Even in Shield Law cases similar to this one, this standard will be difficult to meet since many jurisdictions offer comparable protections in relation to the identity of confidential

sources;[7] when the demanding state falls into this category, the privilege issue could be deferred for resolution by the other jurisdiction under *Codey* without offending New York's public policy. Moreover, before the exception may be invoked, the record must indicate that the prospective witness reasonably relied on the protections afforded under New York law when engaged in the conduct that gave rise to the subpoena request. The standard we set today is high and will, we suspect, seldom be met. Here, however, where there is a substantial likelihood that a New York reporter will be compelled to divulge the identity of a confidential source (or face a contempt sanction) if required to appear in the other jurisdiction—a result that would offend the core protection of the Shield Law, a New York public policy of the highest order—all of these hurdles have been cleared. We therefore conclude that the subpoena application should have been denied.

In light of our resolution of the privilege issue, we have no occasion to address Winter's alternative argument that her statutory claim of undue hardship afforded a separate basis for relief.

Accordingly, the order of the Appellate Division should be reversed, without costs, and the petition dismissed.

SMITH, J. (dissenting). I agree with the majority that New York's Shield Law reflects a strong public policy of the state to protect confidential sources, and that that policy would justify, in a proper case, a refusal to issue a subpoena under the Uniform Act to Secure the Attendance of Witnesses from

---

7. For example, it appears that at least 16 states have adopted privilege statutes that provide absolute protection to a reporter's confidential sources: Alabama, Arizona, California, Delaware, District of Columbia, Indiana, Kentucky, Maryland, Montana, Nebraska, Nevada, New York, Ohio, Oklahoma, Oregon, Pennsylvania (*see* The Committee on Communications and Media Law, New York City Bar Association, *The Federal Common Law of Journalists' Privilege: A Position Paper*, 60 The Record [No. 1] 214-235 at 228 [2005]). Several others provide strong—though not absolute—protection, adopting standards that preclude a reporter from being required to divulge a source except in very limited circumstances. For example, in Arkansas revelation of a source cannot be compelled absent proof that "the article was written, published, or broadcast in bad faith, with malice, and not in the interest of the public welfare" (Ark Code Ann § 16-85-510). West Virginia recently enacted a provision precluding a reporter from being required to divulge the identity of a source (without his or her consent) "unless such testimony or information is necessary to prevent imminent death, serious bodily injury or unjust incarceration" (W Va Code § 57-3-10 [b] [1]). Although we may lead the states in relation to the scope of our journalist privilege, New York is not alone in its recognition of the need to protect sources.

Without a State in Criminal Proceedings. I do not think this is a proper case, however, because the allegedly privileged communications took place wholly in Colorado, and the New York Shield Law does not apply to them.

While the record does not say where Jana Winter was when she spoke to her Colorado law enforcement sources, her brief in this Court concedes that she was in Colorado. (Even without that concession, we would not assume otherwise from a silent record; it is Winter's burden to establish the existence of a privilege.) The majority holds the Colorado location of the communications to be irrelevant, apparently on the ground that Winter's office is located in New York. The majority is holding, in substance, that a New York reporter takes the protection of New York's Shield Law with her when she travels—presumably, anywhere in the world. This seems to me an excessive expansion of New York's jurisdiction, one that is unlikely to be honored by other states or countries or to attain the predictability that the majority says is its goal.

According to the Restatement (Second) of Conflict of Laws (Restatement), the question of whether a particular communication is privileged should be decided either by the "law of the forum" or the "law of the state which has the most significant relationship with the communication" (Restatement § 139). Here, under the Restatement rule, there is no conflict to resolve, because Colorado is both the forum—i.e., the location of the proceeding in which a party seeks to offer an allegedly privileged communication in evidence—and the state with the most significant relationship. A comment to the Restatement says that, "[t]he state which has the most significant relationship with a communication will usually be the state where the communication took place" (Restatement § 139, Comment e), and I see no reason why this case should be an exception.

I am therefore unpersuaded by the majority's claim that Winter "was entitled to rely on" the absolute protection of the New York Shield Law (majority op at 316). Another Restatement comment (§ 139, Comment c) says that "if [the parties to the communication] relied on any law at all, they would have relied on the local law of the state of most significant relationship." Winter chose to leave New York, fly to Colorado, and have conversations in Colorado with her sources. She and her sources could reasonably expect the question of whether their communications were privileged to be governed by Colorado law, just as it would be if Winter were a New York lawyer who

had flown out to meet a Colorado client, or a wife who went to Colorado to talk to her husband.

The majority makes the superficially appealing argument that New York journalists and their sources cannot safely assume that their conversations will be confidential unless the New York Shield Law follows the journalist everywhere (majority op at 316-317). It is true that the universal application of New York law would enhance certainty—but that is a result that New York courts do not have the power to achieve. The majority says: "New York journalists should not have to consult the law in the jurisdiction where a source is located . . . in order to determine whether they can issue a binding promise of confidentiality" (majority op at 317)—but they will always have to do that, despite today's decision, because they cannot be assured that New York courts will decide every case. If Winter had been subpoenaed when she was in Colorado—or if she were to be subpoenaed at some later date, when she travels to Colorado again—no New York court would be involved, and if a Colorado court chose to enforce the subpoena she would have to choose between disclosing her sources and committing contempt. There is nothing the New York courts can do about that.

The simple fact that no one jurisdiction can rule the world is the reason conflict of laws rules exist. The majority's choice to ignore those rules in this case seems to me unjustified, and unlikely to produce either harmony among judicial systems or predictable results in cases that involve a claim of journalist-source privilege.

Chief Judge LIPPMAN and Judges RIVERA and ABDUS-SALAAM concur with Judge GRAFFEO; Judge SMITH dissents and votes to affirm in an opinion in which Judge PIGOTT concurs; Judge READ dissents and votes to affirm for the reasons stated in the opinion by Justice Darcel D. Clark at the Appellate Division (110 AD3d 134).

Order reversed, without costs, and petition dismissed.