Matter of Canning v Revoir (2023 NY Slip Op 04623)

Matter of Canning v Revoir

2023 NY Slip Op 04623

Decided on September 14, 2023

Appellate Division, Third Department

Fisher, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:September 14, 2023

CV-23-1000

[*1]In the Matter of Andrea Canning, Petitioner,
v
Frank B. Revoir Jr., as County Judge of Chenango County, et al., Respondents, and People of the State of New York, Respondent.

Calendar Date:August 17, 2023

Before: Egan Jr., J.P., Clark, Ceresia, Fisher and McShan, JJ.

Davis Wright Tremaine LLP, New York City (Katherine M. Bolger of counsel), for petitioner.
Benjamin K. Bergman, Special Prosecutor, Binghamton, for People of the State of New York, respondent.

Fisher, J.
Proceeding pursuant to CPLR article 78 (initiated in this Court pursuant to CPLR 506 [b] [1]) to prohibit respondent County Judge of Chenango County from enforcing a subpoena requiring petitioner to testify in a criminal trial.
In 2014, petitioner, an investigative journalist for the NBC News, conducted an interview of respondent Ganesh Ramsaran as he was awaiting trial for the murder of his wife (hereinafter the victim). During the interview, Ramsaran denied killing the victim and made several statements relating to the circumstances involving the disappearance and death of the victim. Portions of the interview were used for two Dateline episodes that reported on the victim's death, both of which were nationally televised several times. Ramsaran was subsequently convicted of murder in the second degree; such conviction was ultimately affirmed (see People v Ramsaran, 154 AD3d 1051, 1051 [3d Dept 2017], lv denied 30 NY3d 1063 [2017]; People v Ramsaran, 141 AD3d 865 [3d Dept 2016], revd 29 NY3d 1070 [2017]). Thereafter, following a successful motion pursuant to CPL 440.10, Ramsaran's conviction was vacated and a new trial was ordered.
In preparation for the new trial, respondent People of the State of New York served a subpoena on petitioner, seeking to have her testify at trial in connection with her interview of Ramsaran. Petitioner filed a motion to quash the subpoena before respondent County Judge of Chenango County (hereinafter respondent), arguing that the information sought was protected by the qualified immunity for journalists under Civil Rights Law § 79-h (c), which was opposed by the People. Respondent denied the motion to quash, finding that Civil Rights Law § 79-h did not apply and, nevertheless, such privilege had been overcome. Petitioner commenced this original proceeding pursuant to CPLR article 78, seeking a writ of prohibition preventing respondent from enforcing the subpoena or from holding her in contempt for refusing to testify.[FN1]
Our threshold inquiry is whether a writ of prohibition will lie in this case. A writ of prohibition "is an extraordinary remedy and, in cases involving the exercise of judicial authority, is available only where there is a clear legal right, and then only when a court acts or threatens to act either without jurisdiction or in excess of its authorized powers" (Matter of Heggen v Sise, 174 AD3d 1115, 1116 [3d Dept 2019] [internal quotations marks, ellipsis and citation omitted]; see Matter of Rush v Mordue, 68 NY2d 348, 353 [1986]). To that end, such remedy "does not lie as a means of seeking a collateral review of an error of law, no matter how egregious that error might be, in a pending criminal proceeding, but only where the very jurisdiction and power of the court are in issue" (Matter of Collins v Lamont, 273 AD2d 528, 530 [3d Dept 2000] [internal quotation marks and citation omitted]; see Matter of Hussain v Lynch, 215 AD3d 121, 125-128 [3d Dept 2023]; Matter of Klein v New York State Joint Commn[*2]. on Pub. Ethics, 214 AD3d 1096, 1098 [3d Dept 2023]). The issuance of a writ of prohibition is committed to the sound discretion of the reviewing court, and is premised upon "the gravity of the harm caused by the act sought to be performed by the official[,] whether the harm can be adequately corrected on appeal or by recourse to ordinary proceedings at law or in equity[ ] and whether prohibition would furnish a more complete and efficacious remedy even though other methods of redress are technically available" (Matter of Rush v Mordue, 68 NY2d at 354 [internal quotation marks, ellipsis and citation omitted]; see Matter of County of Suffolk v Kennedy, 211 AD3d 937, 938 [2d Dept 2022]; Matter of Mollen v Mathews, 269 AD2d 42, 46 [3d Dept 2000]).
Examining this matter in such a light, we agree that petitioner has made a sufficient showing that, if in error, respondent exceeded his jurisdiction and power in denying petitioner's motion to quash the subpoena and in ordering her to testify to the information that she obtained in her capacity as a journalist in contravention of Civil Rights Law § 79-h. Known as the New York Shield Law, section 79-h (c) provides that a journalist shall not be "adjudged in contempt by any court in connection with any civil or criminal proceeding" for refusing to disclose information that enjoys the law's qualified privilege for nonconfidential news. Distilled from the reporter's privilege, which has roots from the colonial era and in the free press provisions of the State and Federal Constitutions, the legislative history of the New York Shield Law reveals "that [the Governor] and the [L]egislature intended the statute to provide the highest level of protection in the nation" to journalists working in this State (Holmes v Winter, 22 NY3d 300, 307, 309 [2013] [internal quotation marks and citation omitted], cert denied 572 US 1135 [2014]; see O'Neill v Oakgrove Constr., 71 NY2d 521, 524, 526-527 [1988]). Inasmuch as the New York Shield Law "prohibits a New York court from forcing a reporter to reveal [confidential or privileged materials], both by preventing such a directive from being enforced through the court's contempt power and by rendering any evidence that is covered by the provision inadmissible" (Holmes v Winter, 22 NY3d at 308), we are satisfied that respondent's "very jurisdiction and power" are in issue to afford a collateral review (Matter of Collins v Lamont, 273 AD2d at 530 [internal quotation marks and citation omitted]; see Matter of Hussain v Lynch, 215 AD3d at 128).
Despite the significant origins and purpose of the New York Shield Law, even within the context of a challenge to a ruling involving its provisions, there is no right to appeal "an order resolving a nonparty's motion to quash a subpoena issued after the filing of the accusatory instrument in a criminal proceeding" (People v Juarez, 31 NY3d 1186, 1190 [2018]; see Matter of 381 Search Warrants Directed to Facebook, Inc. [New York County Dist[*3]. Attorney's Off.], 29 NY3d 231, 242 [2017]). Petitioner's other limited options, which may include a challenge to any finding of contempt against her, are untested and implicate her oath and ethics as a journalist (see People v Juarez, 31 NY3d at 1205-1206 [Rivera, J., dissenting]), and further pervert the clear language of the statute and legislative history behind the New York Shield Law that seeks to prevent journalists from being threatened with or charged with contempt in the first instance (see People v Juarez, 31 NY3d at 1208 [Fahey, J., dissenting]; Holmes v Winter, 22 NY3d at 308; see also Matter of Beach v Shanley, 62 NY2d 241, 255 [1984] [Wachtler, J., concurring]). Petitioner's posttrial options, if successful, may further undermine the propriety of Ramsaran's second murder trial, which, given the sensitive nature of murder trials for those involved — especially the victim's family — a writ of prohibition offers a "complete and efficacious remedy" to avoid such outcome, whereas "an appeal or other proceedings would be inadequate to prevent [that] harm" (Matter of Hussain v Lynch, 215 AD3d at 128 [internal quotation marks and citation omitted]). Although "[t]he appealability or nonappealability of an issue is not dispositive" (Matter of Holtzman v Goldman, 71 NY2d 564, 570 [1988]), when considering the gravity of the harm within the backdrop of the significant historical context for the reporter's privilege and the legislative history for the New York Shield Law, coupled with the inadequacy of petitioner's remedies on appeal or in a separate proceeding, we find that a writ of prohibition is appropriately sought by petitioner under these facts and circumstances (see People v Juarez, 31 NY3d at 1191 n 5; Matter of Rush v Mordue, 68 NY2d at 353, 355; see also Matter of Newsday, Inc., 3 NY3d 651, 652 [2004]; Matter of Associated Press v Bell, 70 NY2d 32, 37 [1987]; Matter of Gannett Co. v De Pasquale, 43 NY2d 370, 374 [1977], affd 443 US 368 [1979]).
Turning to the merits, we agree with petitioner that the People were seeking nonconfidential material that triggered the tripartite test set forth in Civil Rights Law § 79-h.[FN2] To overcome the qualified privilege afforded to petitioner under the New York Shield Law, it was incumbent on the People to make "a clear and specific showing that the news: (i) is highly material and relevant; (ii) is critical or necessary to the maintenance of a party's claim, defense or proof of an issue material thereto; and (iii) is not obtainable from any alternative source" (Civil Rights Law § 79-h [c]; see O'Neill v Oakgrove Constr., 71 NY2d at 527). During the interview with petitioner, Ramsaran discussed his love for the victim and his concern when she went missing, stating that he started to get worried once it started to get dark on the day that she disappeared because he "just had a bad feeling," and that he had "told [the police] that [the victim was] a few hours late" and that he had not heard from her in [*4]hours. He also stated that he told his children that the victim would be home after they returned from school that day, and further claimed that he discovered the victim's cell phone in the brush on the side of a rural road through the use of a cell phone locator application. Throughout the interview, Ramsaran posited that the victim had been having an affair based on her obsession with a mobile phone game, changes to her physical appearance and through her conversations with another player, and that this affair was the impetus for her to leave to go meet someone on the day that she disappeared. Although Ramsaran acknowledged that he was having an affair with the victim's best friend, for which he showed no remorse, he told petitioner "I had the perfect life. I had a wife. Had a girlfriend. I have kids. . . . The worst thing to have ever happened to me is [the victim] go[ing] missing." He further acknowledged that he had discussed a divorce with the victim several times. In addition to Ramsaran's statements, the transcript of the interview also included petitioner's observations and reflections of Ramsaran, notably her statement that "[Ramsaran] seem[ed] like a total over-sharer." The transcript also contained several recorded telephone calls between Ramsaran and the police, including 911 calls made on the night of the victim's disappearance and on the day that Ramsaran allegedly discovered her missing cell phone, as well as a telephone call from Ramsaran to his girlfriend discussing their potential marriage.
Even accepting that the information was "highly material and relevant" to the prosecution of Ramsaran, the People failed to establish that it was "critical or necessary." There is a multitude of other evidence against Ramsaran, including the statements that he made during his telephone calls to 911, his girlfriend and to the police, as well as DNA evidence of the blood found on his clothes and the victim's van. Contrary to the People's contentions, Ramsaran's statements during the interview do not contradict any of his other statements, but rather corroborate other available evidence against him (see Matter of Perito v Finklestein, 51 AD3d 674, 675 [2d Dept 2008]). Therefore, although petitioner's testimony as to Ramsaran's statements may be useful to the People's case, the prosecution does not "virtually rise[ ] or fall[ ]" on her testimony, as it is not the only proof supporting the murder charge against Ramsaran (Flynn v NYP Holdings, 235 AD2d 907, 908 [3d Dept 1997] [internal quotation marks and citations omitted]; see Matter of Application to Quash Subpoena to National Broadcasting Co., 79 F3d 346, 351-353 [2d Cir 1996]; see also People v Juarez, 31 NY3d at 1205 [Rivera, dissenting]; cf. People v Bonie, 141 AD3d 401, 404 [1st Dept 2016], appeal dismissed 28 NY3d 956 [2016]).
Similarly, the People failed to satisfy the third prong of the test, which requires a showing that the statutorily protected material was not obtainable from any [*5]other source (see Civil Rights Law § 79-h [c]). Indeed, the jury has the ability to listen to the original recorded telephone calls and decide for itself what probative value to accord to same (see People v Juarez, 31 NY3d at 1205 [Rivera, J., dissenting]), and the People also have the availability of other nonprivileged witnesses, such as the girlfriend and the police, to present testimony for the jury's consideration. Furthermore, as it relates to an alternate source for Ramsaran's demeanor and statements during the interview, although the record fails to indicate whether petitioner provided the People with the identity of an alternate source, the record also demonstrates that this general option was offered to the People. However, the People rejected any alternative source unless that individual reviewed both the published and unpublished materials — which, as aforementioned, implicates the Confrontation Clause (see n 2, supra). Moreover, Ramsaran's statements and demeanor may be available from the video footage of the interview that could be authenticated by the cameraperson or another alternate source. Inasmuch as the People also failed to detail what, if any, efforts they made to obtain such information or materials from an alternate source, it is axiomatic that unobtainability cannot be self-created (see Flynn v NYP Holdings, 235 AD2d at 909; Matter of CBS Inc. [Vacco], 232 AD2d 291, 292 [1st Dept 1996]).[FN3] Based on the foregoing, the People failed to make the "clear and specific showing" required to overcome petitioner's qualified privilege under the New York Shield Law (Civil Rights Law § 79-h [c]; see Flynn v NYP Holdings, 235 AD2d at 909; see also Matter of Gilson v Coburn, 106 AD3d 424, 424 [1st Dept 2013], lv denied 21 NY3d 863 [2013]; Matter of Perito v Finklestein, 51 AD3d at 675), and, therefore, petitioner is entitled to a writ prohibiting respondent from enforcing the subpoena to compel her testimony at Ramsaran's criminal trial. We have examined the parties' remaining contentions and have found them to be without merit or rendered academic.
Egan Jr., J.P., Clark, Ceresia and McShan, JJ., concur.
ADJUDGED that the petition is granted, without costs, and respondent County Judge of Chenango County and respondent People of the State of New York are prohibited from enforcing the subpoena to compel the testimony of petitioner at the criminal trial on the remaining charges in indictment No. 13-57.

Footnotes

Footnote 1: This Court granted petitioner's motion to enjoin the enforcement of the subpoena pending this appeal. 

Footnote 2: Although the People reiterated at oral argument that they were not seeking unpublished materials, and therefore the New York Shield Law was not implicated, this position is belied by the record — particularly the email conversations between counsel. Nevertheless, during a conference on the motion to quash between the parties and respondent, counsel for Ramsaran represented that she would not agree to limit her questioning of an NBC witness to solely the published portions of the report and indicated that she might question such NBC witness on portions of Ramsaran's statements that were edited out of the published Dateline episodes. This raises a significant constitutional question, as the Confrontation Clause prohibits a restriction on Ramsaran's ability to cross-examine the witness to only published material (see Baker v Goldman Sachs & Co., 669 F3d 105, 111 [2d Cir 2012]; United States v Treacy, 639 F3d 32, 43-44 [2d Cir 2011]). For the same reasons, the People's partial waiver argument under the statute is also unavailing as a finding in their favor would similarly impede on Ramsaran's rights under the Confrontation Clause (see Civil Rights Law § 79-h [g]).

Footnote 3: Notwithstanding the failure to satisfy this third prong, the People also failed to demonstrate that Ramsaran's demeanor was "critical or necessary" in a manner that the prosecution will "virtually rise[ ] or fall[ ]" on this testimony (see Flynn v NYP Holdings, 235 AD2d at 908 [internal quotation marks and citations omitted]).