Matter of People v Juarez (2018 NY Slip Op 04684)

Matter of People v Juarez

2018 NY Slip Op 04684 [31 NY3d 1186]

June 27, 2018

Court of Appeals

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, October 3, 2018

[*1]

In the Matter of the People of the State of New York, Appellant,
v
Conrado Juarez, Defendant. Frances Robles, Nonparty Respondent.

Argued June 5, 2018; decided June 27, 2018

Matter of People v Juarez, 143 AD3d 589, reversed.

APPEARANCES OF COUNSEL

Cyrus R. Vance, Jr., District Attorney, New York City (Diane N. Princ, Hilary Hassler and Melissa Mourges of counsel), for appellant.
Levine Sullivan Koch & Schulz, LLP, New York City (Katherine M. Bolger, David A. Schulz and Thomas B. Sullivan of counsel), and Davis Wright Tremaine LLP, New York City (Katherine M. Bolger of counsel), for nonparty respondent.
Cahill Gordon & Reindel, LLP, New York City (Joel Kurtzberg, Nicole Ligon and Ivan Torres of counsel), for Asian American Journalists Association and others, amici curiae.
Baker & Hostetler, LLP, Washington, D.C. (Mark I. Bailen of counsel) and New York City (Peter B. Shapiro of counsel), and Reporters Committee for Freedom of the Press, Washington, D.C. (Bruce D. Brown, Gregg P. Leslie and Caitlin V. Vogus of counsel), for Reporters Committee for Freedom of the Press and others, amici curiae.
Scott D. McNamara, District Attorneys Association of the State of New York (Jordan K. Hummel and Nancy D. Killian of counsel), for District Attorneys Association of the State of New York, amicus curiae.

{**31 NY3d at 1187} OPINION OF THE COURT

Memorandum.
[1] The order of the Appellate Division should be reversed, without costs, and the case remitted to the Appellate Division with directions to dismiss the appeal taken to that Court. Supreme Court's order denying nonparty Frances Robles's motions to quash certain subpoenas served on her was issued in a criminal action. Inasmuch as no direct appellate review of such orders is authorized under CPL article 450, no appeal lies.
It is well-established that "no appeal lies from an order arising out of a criminal proceeding absent specific statutory authorization" (People v Santos, 64 NY2d 702, 704 [1984]; see Matter of 381 Search Warrants Directed to Facebook, Inc. [New York County Dist. Attorney's Off.], 29 NY3d 231, 242 [2017] [collecting cases]). We have explained that
"[t]his has always been so and the underlying policy{**31 NY3d at 1188} is to limit appellate proliferation in criminal matters, sometimes to the seeming detriment of the defendant and sometimes to the detriment of the People. Litigation may be compounded unduly by protracted and multifarious appeals and collateral proceedings frustrating the speedy determination of disputes. Moreover, the frustration may be accomplished by skillful manipulation of appeals and collateral proceedings by those interested in delay"[*2](Matter of State of New York v King, 36 NY2d 59, 63 [1975]; see People v Laing, 79 NY2d 166, 170 [1992]).
This Court has held that an order resolving a motion to quash a subpoena issued prior to the commencement of a criminal action is a final and appealable order inasmuch as it "is civil by nature and [thus] not subject to the rule restricting direct appellate review of orders in criminal proceedings" (Matter of Abrams [John Anonymous], 62 NY2d 183, 192 [1984]; see Facebook, 29 NY3d at 243; Santos, 64 NY2d at 704). By contrast, "an order determining a motion to quash a subpoena . . . issued in the course of prosecution of a criminal action, arises out of a criminal proceeding for which no direct appellate review is authorized" (Santos, 64 NY2d at 704 [citations omitted]).[FN1] 
The critical distinction between orders addressing subpoenas that precede, as opposed to follow, the commencement of a criminal action is grounded in the plain language of the CPL, which governs "[a]ll criminal actions and proceedings" (CPL 1.10 [1] [a]). Specifically, a "criminal action . . . commences {**31 NY3d at 1189}with the filing of an accusatory instrument against a defendant in a criminal court" (CPL 1.20 [16] [a]), and a "[c]riminal proceeding" includes "any proceeding which (a) constitutes a part of a criminal action or (b) occurs in a criminal court and is related to a . . . criminal action . . . or involves a criminal investigation" (CPL 1.20 [18]). Definitionally, an order resolving a motion to quash a subpoena that is issued prior to the filing of an accusatory instrument does not arise within the context of a "criminal action." Moreover, while such an order may relate to a criminal investigation, when issued in a court of general jurisdiction prior to the commencement of a criminal action, it "arises . . . on the civil side of the court" (Santos, 64 NY2d at 704). Therefore, an order resolving a motion to quash a subpoena falls outside of the ambit of the CPL—and its concomitant limitations upon appellate review—when the order is issued before a criminal action begins. Review of an order issued in the investigatory stage does not undermine the legislative aim of "limit[ing] appellate proliferation in criminal matters" (King, 36 NY2d at 63) insofar as appellate practice at this stage cannot be said to intrude significantly upon a criminal action that may never be commenced. The order here, [*3]however, issued after the accusatory instrument was filed, plainly arose in a "criminal action" within the meaning of that term as prescribed by the CPL.[FN2]
[2] We reject Robles's reliance on a line of Appellate Division authority that distinguishes between parties and nonparties to a criminal action, and permits an appeal by a nonparty from{**31 NY3d at 1190} an order resolving the nonparty's motion to quash a subpoena issued even after the commencement of a criminal action (see e.g. People v Laughing, 113 AD3d 956, 957 n 2 [3d Dept 2014]; People v Bagley, 279 AD2d 426, 426 [1st Dept 2001]; People v Johnson, 103 AD2d 754, 755 [2d Dept 1984]; People v Marin, 86 AD2d 40, 42-43 [2d Dept 1982]). These decisions are grounded in the rationale that, whereas a defendant can challenge the order on appeal from a judgment of conviction, an aggrieved nonparty "would irrevocably [be] preclude[d] . . . from any opportunity to vindicate its position before an appellate body, regarding the serious issues raised in its moving papers" (Marin, 86 AD2d at 42). We do not discount this concern. However, despite repeated recommendations from the Advisory Committee on Criminal Law and Procedure that the CPL be amended to allow for an expedited appellate process for nonparties aggrieved by the denial of a motion to quash a subpoena in a criminal action, the legislature has not adopted that approach (see Reports of the Advisory Committee on Criminal Law and Procedure to the Chief Administrative Judge of the Courts of the State of New York, Jan. 2003-Jan. 2008).[FN3] Unless the legislature acts, CPL article 450 does not authorize a [*4]nonparty's appeal under these circumstances. In the absence of statutory authorization, an order resolving a nonparty's motion to quash a subpoena issued after the filing of the accusatory instrument in a criminal proceeding—contrasted with an order issued before the criminal action begins—is simply not appealable (see Santos, 64 NY2d at 704).[FN4]
{**31 NY3d at 1191}We are not unsympathetic to Robles's policy-driven arguments, echoed by our dissenting colleagues, concerning how best to balance the interests of the expedient resolution of criminal actions against the right of a nonparty in a pending criminal action to seek appellate review of an order denying a motion to quash a subpoena when the State's long-standing interests in protecting the newsgathering role of reporters (see O'Neill v Oakgrove Constr., 71 NY2d 521 [1988]), or other weighty third-party concerns, are implicated. Nor do we minimize the significance of the rights provided by article I, § 8 of the New York State Constitution. However, the right to appeal is not premised on the nature of the challenge waged, and this Court cannot "create a right to appeal out of thin air" (Laing, 79 NY2d at 172).[FN5] "That the [l]egislature has not authorized an appeal from an order in a criminal proceeding [*5]is conclusive; and any arguments for a change in the practice . . . must be addressed to [that forum]" (Facebook, 29 NY3d at 251 [internal quotation marks omitted]).[FN6] 

[*6]
Rivera, J. (dissenting). The threshold question presented is whether an order granting or denying a nonparty's motion to quash a subpoena issued in the course of a criminal proceeding is directly appealable. The Appellate Division has uniformly exercised jurisdiction in these cases for decades, treating these orders as final and appealable. Our Court has similarly held that an order denying a motion to quash a subpoena issued in{**31 NY3d at 1192} furtherance of a criminal investigation by a grand jury is final and appealable as an "order in a special proceeding on the civil side of a court vested with civil jurisdiction" (Matter of Abrams [John Anonymous], 62 NY2d 183, 192 [1984]). That same reasoning applies here—first, because the order is final as to the nonparty who cannot seek redress in a posttrial criminal appeal, and, second, because the order does not implicate the underlying policy to avoid delay associated with interlocutory criminal appeals any more than does an appeal from the denial of a motion to quash a grand jury subpoena. Here, the argument in support of direct appealability carries even greater force because the nonparty is a journalist who has invoked a strong countervailing policy in her favor, one applicable regardless of the civil or criminal nature of the action and manifested in the Civil Rights Law's protection against disclosure of news sources.
On the merits, the People have failed to establish that the unpublished materials obtained by the reporter in the course of her newsgathering are "critical or necessary to the maintenance" of the People's case (Civil Rights Law § 79-h [c]). I would therefore affirm the Appellate Division.
I.
The People charged defendant Conrado Juarez with one count of second-degree murder for the killing of "Baby Hope." The underlying crime was tragic and gruesome. In 1991, the partially-decomposed body of a four-year-old girl was found stuffed into a cooler near the Henry Hudson Parkway. A medical examination of the child's body revealed that she had been sexually assaulted and suffocated, but the semen investigators found was too degraded to analyze. For the next two decades, police were unable to identify the deceased or her killer. Finally, in 2013, officers followed investigative leads to the child's mother, and from her to defendant. On October 11 and 12, 2013, defendant gave a videotaped confession to the police, in which he admitted that he had suffocated the victim during a sexual encounter. No forensic evidence connected defendant to the crime.
Four days after his videotaped confession and subsequent arraignment, while he was held in pretrial detention, defendant gave an interview to nonparty Frances Robles, a New York Times investigative journalist. The interview covered, among other things, defendant's family life, arrest, and confession to the police, and lasted about an hour. Although Robles was not{**31 NY3d at 1193} allowed to bring paper into the interview, she made notes about the interview soon afterwards. On October 17, 2013, the New York Times published her article about defendant and the murder of "Baby Hope," in which defendant offered an alternate account of the child's death. Robles wrote that defendant explicitly alleged that his confession to the police was not truthful, although defendant's statement to Robles conformed with his videotaped statement to the police in some respects.
Prior to defendant's Huntley hearing, the People secured two subpoenas to compel Robles' participation in the criminal case. The first subpoena sought Robles' own testimony, and the second sought to compel Robles to surrender her interview notes. Robles moved in New York to quash both subpoenas.
The trial court partly granted and partly denied Robles' requests. Initially, the court granted the motion to quash for the purposes of the Huntley hearing only, concluding the People failed to overcome the strong presumption against disclosure of unpublished news set forth in the Civil Rights Law to protect journalists and their sources (see Civil Rights Law § 79-h). Subsequently, however, the court denied quashal in connection with the underlying criminal trial, and instructed Robles to appear in court to testify and to turn over her notes beforehand for in camera inspection. With respect to the trial itself, the court concluded that the People had met their burden to overcome the statutory protections because the case would turn on circumstantial evidence and defendant's statements about the charges and his relationship to the victim were highly material. Given that defendant might challenge the voluntariness of his confession, it was critical for the People to present all evidence that corroborated his statements, including, in particular, the statements defendant made to Robles, and, moreover, Robles' information was not available from any other source. The court issued its ruling on the motion to quash the subpoenas with respect to the trial itself on August 4, 2016, but stayed its order pending appeal.
The Appellate Division reversed, concluding that the People had not overcome the law's strong protections. The Court concluded that, even in a circumstantial case, the People could only compel the disclosure of material protected by the Civil Rights Law's qualified privilege by making a " 'clear and specific showing' that the disclosure [*7]sought . . . is 'critical or necessary' to the People's proof of a material issue" (143 AD3d 589, 590, [1st Dept 2016], quoting Civil Rights Law § 79-h [c]). {**31 NY3d at 1194}Here, the police were in possession of an admissible videotaped confession, which included all the same relevant information that they expected to obtain from Robles' notes and testimony. Consequently, "[u]nder the circumstances, and in keeping with 'the consistent tradition in this State of providing the broadest possible protection to the sensitive role of gathering and disseminating news of public events,' " the People had not made the necessary showing to compel disclosure (id. [some internal quotation marks omitted], quoting O'Neill v Oakgrove Constr., 71 NY2d 521, 529 [1988]). The People did not allege that the order was nonfinal and nonappealable, and the Appellate Division addressed the merits without any discussion as to jurisdiction. We subsequently granted the People leave to appeal (see 29 NY3d 904 [2017]).
II.
A.
The general rule as articulated by this Court is that there is no right to appeal in a criminal matter absent specific statutory authorization (see Matter of 381 Search Warrants Directed to Facebook, Inc. [New York County Dist. Attorney's Off.], 29 NY3d 231, 242 [2017] [observing that "(n)o appeal lies from a determination made in a criminal proceeding unless specifically provided for by statute"], quoting People v Pagan, 19 NY3d 328, 370 [2012], and citing People v Bautista, 7 NY3d 838, 838-839 [2006]; People v Hernandez, 98 NY2d 8, 10 [2002]; People v De Jesus, 54 NY2d 447, 449 [1981]; People v Zerillo, 200 NY 443, 446 [1911]). Statutory authorization for criminal appeals usually flows from the Criminal Procedure Law, which governs all criminal proceedings, including criminal investigations (see CPL 1.10 [1]; 1.20 [18]).
Contrary to the majority's conclusion, however, that general rule is inapplicable here. Since 1936, this Court has recognized that "orders granting or denying motions to quash subpoenas in criminal investigations and actions" are not governed by the CPL because "a motion to quash subpoenas, even those issued pursuant to a criminal investigation, is civil by nature and not subject to the rule restricting direct appellate review of orders in criminal proceedings" (Matter of Cunningham v Nadjari, 39 NY2d 314, 317 [1976]; Matter of Abrams, 62 NY2d at 192). The legal fiction adopted to explain this conclusion is that denial of a motion to quash a subpoena is "a final and appealable order {**31 NY3d at 1195}in a special proceeding on the civil side of a court vested with civil jurisdiction" (Matter of Abrams, 62 NY2d at 192).
The Appellate Division has consistently so held (see e.g. People v Bagley, 279 AD2d 426 [1st Dept 2001]; People v Marin, 86 AD2d 40 [2d Dept 1982]; People v Cruz, 86 AD3d 782, 782 n 2 [3d Dept 2011]). District Attorneys throughout the state have also taken this position, most recently as amici in Facebook (29 NY3d 231). There the District Attorneys Association of the State of New York conceded that a nonparty has the right to appeal from the denial of a motion to quash a subpoena (brief for amicus curiae District Attorneys Association of the State of New York in Matter of 381 Search Warrants Directed to Facebook, Inc. [New York County Dist. Attorney's Off.], 29 NY3d 231 [2017] at 10-12).[FN1] Unsurprisingly, the People did not challenge the appealability of the order before the Appellate Division or in their initial briefing to us, and only took the position that the order is not appealable in response to a jurisdictional inquiry from this Court. That the People appealed from the Appellate Division order granting the motions to quash without arguing the dispositive challenge of the nonappealability of that order further confirms that the law on direct appeals of motions to quash has long been settled in this state.[FN2]
[*8]{**31 NY3d at 1196}As the Court explained in Matter of Cunningham v Nadjari over 40 years ago,
"[O]n a basis of stare decisis these precedents represent a formidable line of authority, however asymmetrical may appear to be the support for the rule they express and apply. Moreover, there is no suggestion in the legislative history of the Criminal Procedure Law that there was any intention to override these precedents. The arguments based on CPL depend exclusively on the definitional arrangement in that statute, a definitional arrangement more precise, although not significantly different from that in the predecessor statute, the Code of Criminal Procedure, for the purpose of this issue (compare, e.g., CPL 1.20, subd 18 with Code Crim Pro, §§ 5, 515, 962). Consequently, despite respondent's persuasive practical arguments . . . , the court is not now ready to overrule precedents resting upon a history of 40 years" (39 NY2d 314, 317 [1976]).
Nevertheless, while acknowledging this long-established precedent, the majority concludes that the order denying Robles' motions to quash is subject to the jurisdictional rule of this Court that restricts direct appellate review of orders in criminal proceedings unless expressly authorized by the CPL (cf. Facebook, 29 NY3d at 243 [observing that, despite the absence of statutory authorization, "a motion to quash a subpoena issued prior to the commencement of a criminal action, even if related to a criminal investigation, is civil by nature," and therefore "is not subject to the rule restricting direct appellate review of orders in criminal proceedings" (internal quotations marks, emphasis and citations omitted)], citing inter alia Matter [*9]of Abrams, 62 NY2d at 192; Matter of Newsday, Inc., 3 NY3d 651, 652 n [2004]).{**31 NY3d at 1197}
The majority reaches this conclusion by distinguishing an order disposing of a motion to quash issued before the criminal action commences, meaning an order "issued prior to the filing of an accusatory instrument," and the order here, issued after the filing of the indictment (majority mem at 
1189). According to the majority, even if the former relates to the criminal investigation, it arises on the civil side of the issuing court, while the latter, having been filed after the criminal action commences "plainly arose in a 'criminal action' within the meaning of that term as prescribed by the CPL" (majority mem at 
1189).
The majority's analysis focuses on a superficial and ultimately irrelevant consideration. "[I]n deciding whether a proceeding is criminal or civil, we look to the nature of the proceeding and the relief sought" (Matter of Abrams, 62 NY2d at 193). What matters, then, is not when the order is issued but the status of the movant in a criminal proceeding and the remedy for the injury sought to be avoided. In the context of a motion to quash a subpoena, "the relief sought has nothing inherently to do with criminal substantive or procedural law and . . . may arise as easily in the context of a purely civil lawsuit as in a purely criminal case" (id. at 194).[FN3]
Critically, unless the same rules of appealability for orders denying a grand jury motion to quash apply to a nonparty movant after a defendant's indictment, the nonparty is left without any relief—which was also the case before the issuance of the indictment (see Marin, 86 AD2d at 42 [observing that contesting a denial of a motion to quash a subpoena on direct appeal is an "avenue of relief . . . totally unavailable to (a subpoenaed nonparty), who is clearly aggrieved by the{**31 NY3d at 1198} (denial)," and therefore to hold that such denials were unappealable "at this juncture would irrevocably preclude (the nonparty) from any opportunity to vindicate its position before an appellate body"]). In either situation, the nonparty movant is aggrieved and without opportunity for appellate review. Yet, the limit on criminal appeals is in part justified by the opportunity for a direct appeal. A nonparty has no such option and so the rule against interlocutory appeals where there is the possibility of a direct appeal is therefore inapplicable.
The problem created by the majority's ruling here falls particularly harshly on journalists like Robles, whose reputation depends on maintaining confidences in newsgathering. A nonparty journalist is irrevocably aggrieved by the denial of a motion to quash a subpoena, and is forced either to comply with the order and jeopardize the journalist's reputation or to refuse and risk being held in contempt. Those outcomes are completely avoidable by [*10]adhering to this Court's traditional treatment of motions to quash as civil in nature, and an order denying the motion as final and appealable.
B.
The Court's jurisprudence that no appeal lies from an order arising out of a criminal proceeding absent statutory authorization is grounded in a pragmatic public policy, one that has more to do with avoiding delay than with abstract concepts of the courts' jurisdiction (see Matter of Santangello v People, 38 NY2d 536, 538 [1976]). As the Court has observed:
"[T]he underlying policy is to limit appellate proliferation in criminal matters, sometimes to the seeming detriment of the defendant and sometimes to the detriment of the People. Litigation may be compounded unduly by protracted and multifarious appeals and collateral proceedings frustrating the speedy determination of disputes. Moreover, the frustration may be accomplished by skillful manipulation of appeals and collateral proceedings by those interested in delay. . . .
"No trial can be conducted while appellate courts by their own protracted proceedings review the alleged errors which may arise preliminary to the trial, during the trial, and before verdict and judgment. Such a system is neither civilized nor even{**31 NY3d at 1199} rational. And most certainly it would make speedy trial a legal impossibility" (Matter of State of New York v King, 36 NY2d 59, 63-64 [1975]).
A motion to quash a subpoena, however, does not raise these concerns.
"A motion to quash is limited in scope, challenging only the validity of the subpoena or the jurisdiction of the issuing authority; and should be made prior to the return date, thereby requiring such timeliness that substantial delay in the proceedings is unlikely. Moreover, where granted, it results in completely voiding the process, thus saving the needless expenditure of litigation effort" (Santangello, 38 NY2d at 539 [citations omitted]).
Thus, the strict formalism that the majority seeks to impose here is not supported by sound policy.
Moreover, I fail to see how policy concerns about the potential delay attendant to the proliferation of criminal appeals do not also hold true for orders arising out of a criminal investigation, which the majority acknowledges are directly appealable. That being the case, the distinction between a motion to quash filed before or after the commencement of a criminal action is of no consequence.
In any case, the alternatives available to a nonparty seeking some type of appellate review of the denial of a motion to quash will likely result in even greater delay of the criminal proceeding than would a direct appeal of a quashal motion. The two avenues left open to a nonparty to contest a denial would be a CPLR article 78 proceeding in the nature of prohibition or for the nonparty to simply fail to comply with the subpoena and seek appellate review of the subsequent order of contempt. In either case, if the prosecutor or defendant needed the nonparty's evidence, they would wait until the resolution of the collateral proceedings. Indeed, failure to provide an adjournment to a defendant might arguably impact a defendant's constitutional right to present a defense (see e.g. Crane v Kentucky, 476 US 683, 690 [1986] [observing that "(w)hether rooted directly in the Due Process Clause of the Fourteenth Amendment, Chambers v Mississippi (410 US 284 [1973]), or in the Compulsory Process or Confrontation clauses of the Sixth Amendment . . . the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense," which includes the {**31 NY3d at 1200}opportunity to present relevant, reliable, materially significant evidence (internal quotation marks and citations omitted)]).[FN4] [*11]C.
The majority seeks not only to restrict this Court's jurisdiction to hear the appeal of a denial of a nonparty's motion to quash a subpoena, but to prevent the Appellate Division from doing so as well (see majority mem at 
1188 n 1). Arguably, this is not within the Court's power. Article VI, § 4 (k) of the New York State Constitution guarantees the Appellate Division "the jurisdiction possessed by [it] on the effective date of this article," allowing said jurisdiction to be "limited or conditioned by law" only with respect to nonfinal orders or judgments. In other words, neither the legislature nor the Court of Appeals may decrease the Appellate Division's jurisdiction from what it was in 1962, when article VI, § 4 (k) became effective. Of course, by then, it had already been more than 25 years since this Court had explicitly recognized that a denial of a nonparty motion to quash a subpoena issued in conjunction with a criminal matter was appealable (see People v Doe, 272 NY 473 [1936], affg 247 App Div 324 [2d Dept 1936]). The Appellate Division's jurisdiction to hear appeals like the kind at issue here should, then, enjoy constitutional protection. The majority improperly relies on an interpretation of the Criminal Procedure Law—a statute—to overrule a provision of our State Constitution.[FN5]{**31 NY3d at 1201} [*12]III.
Robles argues that she is a journalist who interviewed defendant in the course of gathering news and so her testimony and notes are privileged under Civil Rights Law § 79-h, New York's Shield Law. Section 79-h (c) states that a journalist shall not be "adjudged in contempt by any court in connection with any civil or criminal proceeding" for refusing to disclose information that enjoys the law's qualified privilege.[FN6] This provision provides the statutory authority for a journalist's appeal from the denial of a motion to quash a subpoena in a criminal proceeding.[FN7]
Even if the Shield Law did not stand as a statutory basis for jurisdiction, it embodies a compelling policy justification for a direct appeal of the denial of a journalist's motion to quash a subpoena in a criminal proceeding, regardless of whether such{**31 NY3d at 1202} orders would be in general appealable by nonparties if issued post-indictment. That policy is manifest in the broad scope of the journalist's privilege recognized by the legislature, which applies even to nonconfidential materials, in both civil and criminal proceedings, and protects journalists from being held in contempt by the judiciary, legislature, or any other body having contempt powers. This countervailing public policy is at least as significant, if not more so, than the general concern with appellate proliferation in criminal matters that serves as the foundation for the Court's limits on criminal appeals.
Other jurisdictions have long recognized the force of this argument. For this reason, a journalist's challenge to a subpoena issued in conjunction with a criminal trial is appealable on the basis of state shield laws in many other states (see e.g. In re Paul, 270 Ga 680, 513 SE2d 219 [1999]; Alaska Stat § 09.25.330 [Alaska]; Minn Stat § 595.024 [3] [Minnesota]; [*13]NM Stat Ann § 38-6-7 [C] [New Mexico]). There is a profound irony that New York, a historic champion of the free press and home to some of this country's greatest newsgathering organizations, would deny a direct appeal that our peers grant.
The order denying the motion to quash the subpoenas is therefore final and appealable.
IV.
Turning to the merits, the People argue that they have made out a clear and specific showing that Robles' testimony and notes are critical or necessary to the People's case. They argue, in essence, that the information in Robles' possession helps confirm defendant's confession, refutes the claim that his confession was coerced, and goes to establish his guilty mind, and that, further, there are no other sources on which the People could rely to make out their argument. Robles responds that, in light of the videotaped confession already in their possession, the People's expected use of her testimony amounts to mere bolstering, and to overcome the protection of the Shield Law requires a quantifiably greater showing than the existence of mere additional supportive material.
Under Civil Rights Law § 79-h (c), a journalist may not be held in contempt for failing to disclose unpublished news and a court a may not order that news' disclosure
"unless the party seeking such news has made a clear and specific showing that the news: (i) is{**31 NY3d at 1203} highly material and relevant; (ii) is critical or necessary to the maintenance of a party's claim, defense or proof of an issue material thereto; and (iii) is not obtainable from any alternative source."
There is no dispute here that the People have met the first and third prongs. However, the People have not met the second prong, because they have failed to make a clear and specific showing that the news they seek disclosed "is critical or necessary" to their claim.
This Court has not previously opined on the proper standard to use to assess whether a party has fulfilled the "critical or necessary" prong for the disclosure of information enjoying a qualified privilege. The Appellate Division has largely adopted a test articulated by the Second Circuit Court of Appeals (see Matter of Perito v Finklestein, 51 AD3d 674, 675 [2d Dept 2008] [articulating a test relying, among other cases, on In re Application to Quash Subpoena to Natl. Broadcasting Co., Inc., 79 F3d 346, 351 (2d Cir 1996)]; Flynn v NYP Holdings, 235 AD2d 907, 908 [3d Dept 1997] [same]; see also 143 AD3d at 590 [implicitly adopting the same test]). Under that test, the party seeking disclosure must establish that "the claim for which the information is to be used virtually rises or falls with the admission or exclusion of the proffered evidence" (In re Application to Quash Subpoena to Natl. Broadcasting Co., Inc., 79 F3d at 351 [internal quotation marks and citations omitted]). I would adopt this firm test as the law of New York as it pithily expresses the second prong of the Shield Law's heavy burden imposed on the party seeking disclosure.
A strong test also furthers the legislative intent. The creation of an explicit statutory protection for non-confidential, unpublished news sought in conjunction with a criminal or civil proceeding dates to the Shield Law's amendment in 1990. At the time, the legislature was particularly worried about "the most problematic incursions into the integrity of the editorial process" that journalists encounter "when they are drawn into the criminal justice system merely because they have reported on a crime" (Governor's Program Bill Mem, Bill Jacket, L 1990, ch 33 at 10, 1990 McKinney's Session Laws of NY at 2332). To guard against "the risk [that journalists will be] used as investigative agents of the government or the defense," the 1990 amendment to the Shield Law thus offered explicit "protection of non-confidential information and sources" where it is most needed, "in criminal cases" (id.). In supporting {**31 NY3d at 1204}the amendments, the New York State Bar Association's Special Committee on Media Law observed that "[n]umerous federal and state courts, and many legislatures, have recognized that the forced disclosure of any journalistic work product or information interferes with the newsgathering and editorial functions of the press, regardless of whether a source's confidences are at stake" (Mem of NY St Bar Association Special Comm on Media Law, Bill Jacket, L 1990, ch 33 at 39). Although the bill as enacted did not create a blanket privilege for all unpublished news, it was widely understood to create a very high standard for disclosure and was, for this reason, opposed by some parties. For example, the New York State Defenders Association opposed the amendment because, "[b]y its terms, the expanded law prevents both prosecutors and defendants from obtaining non-confidential, relevant information," and "[t]he standard of proof [they] must meet before they can review [such] information . . . is unreasonably high" (see Mem of NY St Defenders Association, Bill Jacket, L 1990, ch 33 at 18).
The test also reflects our State's singular public policy to protect journalists and their sources. As we observed 30 years ago, there is a deep, "consistent tradition in this State of providing the broadest possible protection to 'the sensitive role of gathering and disseminating news of public events' " (O'Neill, 71 NY2d at 529, [*14]quoting Matter of Beach v Shanley, 62 NY2d 241, 256 [1984, Wachtler, J., concurring]). New York State's constitutional guarantee of freedom of speech and the press is far more expansive than the federal government's (compare NY Const, art I, § 8 with US Const 1st Amend). Long before the United States Supreme Court had made the First Amendment binding on the states, our State Constitution offered explicit protection for all "citizen[s] [to] freely speak, write and publish [their] sentiments on all subjects," and forbade the legislature from passing any law that would "restrain or abridge the liberty of speech or of the press" (NY Const, art I, § 8; see also O'Neill, 71 NY2d at 529 n 3 [observing that "(t)he protection afforded by the guarantees of free press and speech in the New York Constitution (remains) often broader than the minimum required by the First Amendment"]).
Expansive protection for the press in New York is not just in our Constitution; it is in our history. From John Peter Zenger's acquittal in 1735 on charges of libel for his publication of articles critical of the royal governor (see Allen Pusey, August 4, 1735: John Peter Zenger Acquitted, ABA J [Aug. 2013]) to{**31 NY3d at 1205} this Court's decision in Matter of Holmes v Winter (22 NY3d 300 [2013]) announced just five years ago, quashing a subpoena that would have forced a New York journalist to disclose a confidential source in a criminal proceeding in another state, New York has a centuries-long tradition of protecting newsgathering. The Shield Law, now nearly 50 years old, is embedded in that venerable tradition. It has been amended multiple times, always strengthening its protections, sometimes in response to courts that "pierce[d]" it, failing "to follow [its] letter or even . . . spirit" (Mem of Assembly Member Steven Sanders, Bill Jacket, L 1981, ch 468, 1981 NY Legis Ann at 257). Given our State's history of according the strongest of protections to the press, we should adopt an evidentiary test that sets a high bar and maximizes the protective coverage under the privilege.
Here, the People failed to make a clear and specific showing that their case "rises or falls with the admission or exclusion" of Robles' testimony and notes, and so have not established the "critical or necessary" prong of Civil Rights Law § 79-h (c). The People have a video of defendant's statement to the police, and nothing defendant said after the videotaping, during his pretrial incarceration interview, sheds light on whether his statements as recorded were voluntary or coerced. Moreover, the trial court has already held that the video is admissible, and the jury can watch it and decide for itself what if any probative value to accord defendant's confession. Since the People failed to carry their burden, the Appellate Division properly concluded that the motion to quash should be granted and I would affirm that Court's order.[FN8] V.
The result of the majority's decision will be that Robles, other journalists, and nonparties will have to risk contempt if they are unwilling to comply with a subpoena order. In Robles' case, the choice is to testify and turn over her notes and breach her journalist's oath and ethics, or refuse to comply with Supreme Court's order and be held in contempt. The majority does not even clarify whether courts would have jurisdiction over her{**31 NY3d at 1206} possible, future appeal from a contempt order (but see Santangello, 38 NY2d at 540 [suggesting that contempt orders would be subject to appellate review]). This choice places Robles and all other journalists in a terrible bind. It is a reversal of our settled law and against our State's strong historical protections of journalists and the newsgathering process. I dissent.

Fahey, J. (dissenting). In New York, there is no right to protection from government interference that has been held in higher esteem than freedom of speech and the press. We honor it highly because we value our liberty above all else.
The protections embodied in article I, § 8 of the New York Constitution cannot be limited by the legislature's failure to provide a nonparty with the right to appeal. If those constitutional protections are to be preserved, a nonparty must have a right to appeal on the basis of a constitutional violation. Without the right to challenge what may be an erroneous ruling constitutional privileges cannot be fully protected. Nonparty Frances Robles seeks to vindicate those protections. I would hold that she has the right to appeal, regardless of any provision in the Criminal Procedure Law to the contrary.
Both the majority and Judge Rivera have raised important issues regarding the legislature's failure to amend the Criminal Procedure Law to provide nonparties with the right to appeal from denial of a motion to quash a subpoena issued in a criminal action, as well as the proper interpretation of prior case law from the Appellate Division and this Court regarding a nonparty's right to appeal from such an order issued during a criminal investigation. Significant concerns surrounding various evidentiary privileges that may be claimed by a nonparty cannot be addressed by an appellate court unless the nonparty has the right to appeal from such an order. I write separately because, in my view, the central issue in this case is that Robles seeks to vindicate one of the most fundamental constitutional rights our State has provided to its citizens. That must take precedence over the statutory provisions of the Criminal Procedure Law.[FN1]
Article I, § 8 of the New York Constitution provides that "[e]very citizen may freely speak, write and publish his or her{**31 NY3d at 1207} sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press." This provision "was adopted in 1821, before the First Amendment was rendered applicable to the states" (Matter of Holmes v Winter, 22 NY3d 300, 307 [2013], cert denied 572 US &mdash, 134 S Ct 2664 [2014]). "The drafters chose not to model our provision after the First Amendment, deciding instead to adopt more expansive language" (id.). "This was in keeping with 'the consistent tradition in this State of providing the broadest possible protection to the sensitive role of gathering and disseminating news of public events' " (id. at 308 [internal quotation marks omitted], quoting O'Neill v Oakgrove Constr., 71 NY2d 521, 529 [1988]). Thus, "[t]he protection afforded by the guarantees of free press and speech in the New York Constitution is often broader than the minimum required by the First Amendment" (O'Neill, 71 NY2d at 529 n 3).
In keeping with this tradition, the legislature enacted the Shield Law in 1970 (see L 1970, ch 615). The law was intended to "make New York State—the Nation's principal center of news gathering and dissemination—the only state that clearly protects the public's right to know and the First Amendment rights of all legitimate [*15]newspapermen, reporters and television and radio broadcasters" (Governor's Mem approving L 1970, ch 615, 1970 McKinney's Session Laws of NY at 3112). In his memorandum approving the Shield Law, Governor Nelson Rockefeller stated that "[f]reedom of the press is one of the foundations upon which our form of government is based," and that "[a] representative democracy, such as ours, cannot exist unless there is a free press both willing and able to keep the public informed of all the news" (id.; see also Holmes, 22 NY3d at 308-309).
The Shield Law has been "amended several times in an effort to strengthen its provisions, often in response to judicial decisions that the legislature viewed as affording inadequate protections to reporters" (Holmes, 22 NY3d at 310). In its current form, the Shield Law provides "[a]bsolute protection" to journalists and newscasters from contempt or other punishment for refusing to disclose confidential news or sources (Civil Rights Law § 79-h [b], [e]). In 1988, this Court declared in O'Neill that the Federal and State Constitutions afforded reporters a qualified privilege for nonconfidential materials "prepared or collected in the course of newsgathering" (O'Neill, 71 NY2d at 524). The Court reasoned that{**31 NY3d at 1208}
"[t]he autonomy of the press would be jeopardized if resort to its resource materials, by litigants seeking to utilize the newsgathering efforts of journalists for their private purposes, were routinely permitted . . . . Moreover, because journalists typically gather information about accidents, crimes, and other matters of special interest that often give rise to litigation, attempts to obtain evidence by subjecting the press to discovery as a nonparty would be widespread if not restricted on a routine basis. The practical burdens on time and resources, as well as the consequent diversion of journalistic effort and disruption of newsgathering activity, would be particularly inimical to the vigor of a free press" (id. at 526-527).
Two years later, the legislature codified O'Neill by amending the Shield Law to provide a qualified privilege for unpublished, nonconfidential news, which privilege may be overcome only by "a clear and specific showing that the news: (i) is highly material and relevant; (ii) is critical or necessary to the maintenance of a party's claim, defense or proof of an issue material thereto; and (iii) is not obtainable from any alternative source" (Civil Rights Law § 79-h [c]; see L 1990, ch 33; see also People v Combest, 4 NY3d 341, 345-346 [2005]). It was this qualified privilege for nonconfidential news that Robles relied on below in seeking to avoid disclosure of material that was not published in her article.[FN2]
The People have argued that in lieu of the statutory right to appeal, Robles could refuse to comply with the subpoena even after the court has denied a motion to quash and be held in contempt, thereby creating an appealable order. I strongly disagree that contempt is an appropriate or sufficient substitute for a direct appeal. When the Shield Law was first enacted in 1970, the Governor recognized that "[t]he threat to a news[person] of being charged with contempt and of being imprisoned for failing to disclose . . . information or its sources can significantly reduce his [or her] ability to gather vital information" (Governor's Mem approving L 1970, ch 615, 1970 McKinney's Session Laws of NY at 3112). The Shield Law{**31 NY3d at 1209} unequivocally protects professional journalists and newscasters from being held in contempt for refusing to reveal confidential news, or for refusing to reveal nonconfidential unpublished news if the qualified privilege has not been overcome (see Civil Rights Law § 79-h [b], [c]). It would be a bewildering irony for our criminal justice system to require a journalist to be held in contempt in order to assert those protections before an appellate body when the Shield Law itself expressly protects journalists from a contempt adjudication. Journalists [*16]should not be required to disobey the law, and potentially commit a criminal act (see Penal Law §§ 215.50 [3]; 215.54), in order to vindicate the rights afforded to them by the State Constitution and by the legislature itself.
In his concurring opinion in Matter of Beach v Shanley (62 NY2d 241 [1984]), which we have subsequently cited with approval (see Holmes, 22 NY3d at 307, 311; O'Neill, 71 NY2d at 529), Judge Wachtler opined that article I, § 8 of the New York Constitution "should leave no doubt that it necessarily affords a reporter or newspaper the right not to be held in contempt for refusal to disclose news sources to State investigators or investigative bodies, irrespective of any privileges granted by the Legislature now or in the future" (Beach, 62 NY2d at 255 [Wachtler, J., concurring]). I would hold that the State Constitution similarly leaves no doubt that it necessarily affords a journalist the right to directly appeal from an order denying a motion to quash a subpoena issued in a criminal action, "irrespective of any privileges granted by the Legislature now or in the future" in the Criminal Procedure Law (id.). We need not wait for the legislature to act in order to uphold our tradition "of providing the utmost protection of freedom of the press" (Holmes, 22 NY3d at 307). I respectfully dissent.
Chief Judge DiFiore and Judges Stein, Garcia and Feinman concur; Judge Rivera dissents in an opinion in which Judge Wilson concurs; Judge Fahey dissents in a separate dissenting opinion in which Judge Wilson concurs.
Order reversed, without costs, and case remitted to the Appellate Division, First Department, with directions to dismiss the appeal to that court, in a memorandum.

Footnotes

Footnote 1:Judge Rivera's claim that our decision impermissibly intrudes upon the jurisdiction of the Appellate Division as granted under article VI, § 4 (k) of the New York State Constitution (see Rivera, J., dissenting op at 
1200) is misguided. That section specifies that "the right to appeal to the appellate divisions from a judgment or order which does not finally determine an action . . . may be limited or conditioned by law." As this Court has explained, "[t]he text of the controlling constitutional provision . . . permits the Legislature to expand the jurisdiction of the Appellate Division but not contract it, except with regard to appeals from nonfinal orders" (People v Pollenz, 67 NY2d 264, 270 [1986] [emphasis added]; see People v Farrell, 85 NY2d 60, 67 [1995]). Unlike "the denial of an application to quash subpoenas issued in furtherance of a criminal investigation [before an accusatory instrument is filed] . . . [which is] a final and appealable order" (Matter of Abrams, 62 NY2d at 192), we now clarify that the denial of a motion to quash a subpoena within the context of a criminal action is a nonfinal order. Thus, in limiting appellate review of such an order, "the [l]egislature acted in accordance with article VI, § 4 (k) of the New York Constitution, not in violation of it" (Farrell, 85 NY2d at 70).

Footnote 2:Contrary to Judge Rivera's contention (Rivera, J., dissenting op at 
1197), the critical consideration under the CPL is indeed when the order resolving the motion to quash was issued, i.e. before or after a criminal action has been commenced. This bright-line rule focuses on the filing of the accusatory instrument, a critical milestone that carries with it significant consequences for both parties to the criminal action. For example, it is "at that point [when] the People incur[ ] the obligation of being ready for trial" within the relevant time period (People v Osgood, 52 NY2d 37, 43 [1980]; see CPL 30.30; see also Barker v Wingo, 407 US 514 [1972]). Relatedly, Judge Rivera's intimation that a nonparty's pursuit of another avenue to seek appellate relief would inevitably delay the separate criminal proceeding—because "if the prosecutor or defendant needed the nonparty's evidence, they would wait until the resolution of the collateral proceedings" (Rivera, J., dissenting op at 
1199)—ignores both the People's obligation to declare readiness for trial and the constitutional speedy trial rights of criminal defendants (see generally CPL 30.30 [4] [a]). In the event that any potential nonparty witness chooses not to comply with an order to testify or to provide information to the People, the criminal action nevertheless proceeds, and the People must balance their need for the subpoenaed information and their willingness to await the resolution of a collateral proceeding with the need to proceed swiftly.

Footnote 3:The assertion in Judge Rivera's dissent that our decision is contrary to "long . . . settled" law (Rivera, J., dissenting op at 
1195) is belied by the fact that this Court recommended, almost two decades ago, that the Advisory Committee on Criminal Law and Procedure consider studying this very issue, explaining that "[t]he lack of statutory authority in a criminal case for a nonparty's appeal from an order denying the nonparty's motion to quash a subpoena is a topic that might profitably receive the Committee's attention, particularly if remedial legislation is thought to be appropriate" (Letter from Stuart M. Cohen, Clerk of the Court of Appeals, to Hon. Patricia D. Marks and Hon. Steven W. Fisher, Co-Chairs, Advisory Committee on Criminal Law and Procedure [May 7, 2001]). The ensuing Advisory Committee reports recommending amendments to the CPL to add an expedited appellate process for nonparties to challenge the denial of a motion to quash a subpoena issued during the course of a criminal prosecution acknowledge that "[t]he Court of Appeals has not squarely addressed the question" and proffer that the proposed "measure would provide much needed uniformity and clarity in this area" (Report of the Advisory Committee, Jan. 2008 at 187, 189).

Footnote 4:[2] To the extent that our prior decisions could be read as endorsing a broader rule that would vest nonparties to pending criminal actions with the right to direct appellate review (see e.g. Matter of Newsday, Inc., 3 NY3d 651, 652 n [2004]; Matter of Constantine v Leto, 77 NY2d 975 [1991]; Matter of Cunningham v Nadjari, 39 NY2d 314, 317 [1976]), we now clarify that such a rule would be contrary to the plain language of the CPL.

Footnote 5:We do not address whether Robles could have pursued relief by commencing a CPLR article 78 proceeding, "from which an appeal to this Court might ultimately have been taken" (Newsday, 3 NY3d at 652).

Footnote 6:Although our dissenting colleagues highlight the policy considerations animating the legislature's enactment of the Shield Law (see Rivera, J., dissenting op at 
1192, 1201-1202; Fahey, J., dissenting op at 1207-1208), "[a]ny debates about the balancing of such concerns is beside the point, because the weighing of these policy considerations is not ultimately within our province" (Facebook, 29 NY3d at 251). Ironically, Judge Rivera's dissent acknowledges that the other jurisdictions that have "recognized the force of" these policy considerations and have imbued journalists with the right to seek appellate relief have typically done so by statute (Rivera, J., dissenting op at 
1202 [citing Alaska Stat § 09.25.330; Minn Stat § 595.024 (3); NM Stat Ann § 38-6-7 (C)]). We are not authorized to write into the CPL a right that the legislature has yet to include, despite repeated urging by the Advisory Committee on Criminal Law and Procedure.

Footnote 1:"The District Attorneys Association of the State of New York . . . is a state-wide organization composed of elected District Attorneys from throughout New York State" whose members are charged "with the responsibility for the investigation and prosecution of crimes committed in their respective jurisdictions" (brief for amicus curiae District Attorneys Association of the State of New York in Matter of 381 Search Warrants Directed to Facebook, Inc. [New York County Dist. Attorney's Off.], 29 NY3d 231 [2017], at 1-2).

Footnote 2:The majority's reliance on a letter from the Clerk of the Court to the Advisory Committee on Criminal Law and Procedure to suggest that the appealability of such motions was not settled law is misplaced (see majority mem at 
1190 n 3). By the letter's own terms, it simply recommended a topic of study to the Advisory Committee. The letter was not law, could not make law, and did not make law. Of course, by the time the letter was written, the Court was well aware of Appellate Division practice (see e.g. People v Bagley, 96 NY2d 711 [2001] [denying a motion for leave to appeal to the Court from an Appellate Division order ruling on a nonparty's appeal of a motion to quash a subpoena issued in conjunction with a pending criminal trial]; Matter of Constantine v Leto, 77 NY2d 975 [1991] [affirming an Appellate Division order issued in similar circumstances]).
The majority's reliance on the un-enacted reforms proposed by the Advisory Committee is similarly misplaced. The recommendations sought to clarify the law. In any case, the very fact that the legislature has chosen not to amend the CPL in light of its consistent interpretation by our Court and other New York courts to allow the appealability of motions to quash subpoenas issued in conjunction with criminal matters strongly suggests that the legislature's understanding of the CPL is the same as that reflected in the various precedents (see Desrosiers v Perry Ellis Menswear, LLC, 30 NY3d 488, 497 [2017] [observing that, although the Court has "often been reluctant to ascribe persuasive significance to legislative inaction," "(w)hen the Legislature, with presumed knowledge of the judicial construction of a statute, (forgoes) specific invitations and requests to amend its provisions to effect a different result, we have construed that to be some manifestation of legislative approbation of the judicial interpretation" (internal quotation marks omitted)]).
Footnote 3:The majority's claim that motions to quash subpoenas issued in conjunction with criminal investigations, before an accusatory instrument has been filed, are "outside the ambit of the CPL" is puzzling (majority mem at 
1189). It is plain that the CPL governs not only criminal actions but criminal investigations as well (see CPL 1.10 [1] [a] [specifying that the CPL applies "exclusively" to "(a)ll criminal actions and proceedings"]; 1.20 [18] [defining a criminal proceeding to include "any proceeding which . . . involves a criminal investigation"]), and grand jury proceedings in particular (see CPL 190.05 et seq. [laying out the procedure that governs grand jury proceedings]). Insofar as motions to quash subpoenas issued in conjunction with criminal investigations are appealable, it is not because they fall outside the CPL, but because this Court has created a legal fiction to allow their direct appeal. Although the majority is correct that the filing of an accusatory instrument triggers significant consequences for both parties (see majority mem at 
1189 n 2), the threshold applicability of the CPL is not one of them.

Footnote 4:The majority's claim that the People's obligation to be ready for trial and the defendant's right to a speedy trial will ensure that criminal trials are not unduly delayed misses the point (see majority mem at 
1189 n 2). Certainly an article 78 proceeding in the nature of prohibition or the appeal of a contempt order, the resolution of which would determine what evidence would be available for trial, could provide a ground for a court to stop the speedy trial clock (see e.g. CPL 30.30 [4] [g] [instructing courts not to count "periods of delay occasioned by exceptional circumstances" against the speedy trial clock, including continuances granted "because of the unavailability of evidence material to the people's case, when the district attorney has exercised due diligence to obtain such evidence and there are reasonable grounds to believe that such evidence will become available in a reasonable period"]). In such cases, to force the underlying trial to go forward without appellate review would create additional, grave problems. It neither furthers the ends of justice, nor enhances the efficiency of criminal prosecutions to force parties to move forward without evidence they deem critical, on the backs of nonparties whose only alternative may be to risk contempt to protect their rights.

Footnote 5:The majority's claim that somehow this diminution in the Appellate Division's jurisdiction passes constitutional muster because it was enacted by the legislature is equally mistaken (see majority mem at 
1188 n 1). As the majority acknowledges, neither the Court, nor the legislature has the power to diminish the Appellate Division's jurisdiction with respect to final orders below where it was in 1962 (see id.). At that time, it was widely understood that the Appellate Division had jurisdiction over denials of motions to quash subpoenas issued in conjunction with criminal matters. The Appellate Division's jurisdiction to hear these appeals, then, should be inviolate.
The majority claims that it is not shrinking the Appellate Division's jurisdiction, merely "clarify[ing] that the denial of a motion to quash a subpoena within the context of a criminal action is a nonfinal order" (id. at 
1188 n 1). This is an ipse dixit. Why a denial of a motion to quash a subpoena issued in conjunction with a grand jury proceeding should be final, and therefore appealable, while one issued in conjunction with a criminal trial is nonfinal, is a question the majority does not even attempt to answer. Indeed, according to the majority's own argument, the former should be "less final" than the latter, since not all grand jury proceedings issue in indictments (see majority mem at 
1188-1189). Both are obviously final with respect to the subpoenaed nonparty (see generally Arthur Karger, Powers of the New York Court of Appeals § 5:10 at 137 [3d ed rev 2005] [describing the "third party finality principle, which comes into play when a motion or petition is presented in an action or proceeding that affects the rights and/or liabilities of a third person who was not previously a party thereto"]).
Footnote 6:While the statute only provides a "[q]ualified protection for nonconfidential news," it provides "[a]bsolute protection for confidential news" (compare Civil Rights Law § 79-h [c], with id. § 79-h [b]). In other words, although a journalist may be required under certain limited circumstances to disclose nonconfidential news (see infra part IV), a newsperson may never be held in contempt "for refusing or failing to disclose any news obtained or received in confidence . . . notwithstanding that the material [sought] . . . is . . . highly relevant to a particular inquiry of government" (Civil Rights Law § 79-h [b]).

Footnote 7:As I find that the Shield Law provides a sufficient statutory foundation for overcoming the limits on interlocutory criminal appeals contained in the CPL, I do not have reason to rely on Judge Fahey's alternate, constitutional argument. His analysis, however, is perfectly congruent with my own.

Footnote 8:Of course, a defendant's constitutional rights to a fair trial and confrontation supersede the statutory protections of the Shield Law. Since I conclude that the People have not met their burden and the motion to quash was properly granted, I have no occasion to opine on whether a defendant's rights would require greater disclosure than might otherwise be permitted under the statute.

Footnote 1:I do not suggest that criminal defendants would have the right to directly appeal from an interlocutory order in a criminal action simply because they might also seek to vindicate important constitutional rights. A criminal defendant, unlike a nonparty to the underlying criminal action, may raise those constitutional issues on an appeal from the judgment.

Footnote 2:I express no opinion with respect to whether the lower courts properly applied the three-part test for qualified privilege under the Shield Law in this particular case (see Civil Rights Law § 79-h [c]). An appeal must be available here because of the utmost importance of the rights Robles seeks to preserve, regardless of whether she is correct that they have been violated.